In the Matter of the Judicial Settlement of the Account of Proceedings of THE MERCANTILE TRUST COMPANY, as Executor, etc., of CHARLES KESSLER SMITH, Deceased, Appellant.

CHARLES STUART VON LUTNOW SMITH, Appellant, Respondent; ADELENA MUHLENBACK SMITH, Respondent, Appellant.

(First Department, April 18, 1913.)

EXECUTORS AND ADMINISTRATORS—COMPLIANCE WITH ORDER OF SURROGATE TO SELL STOCK—DISCRETION OF EXECUTOR—POSSESSION OF PERSONAL PROPERTY BY LIFE TENANT—SECURITY FOR PROTECTION OF REMAINDERMAN.

A testator died leaving a widow and son who resided at Paris, France. The will provided the wife should have the use and benefit of all the property, both real and personal, for her life, with remainder to the son, upon condition that she should educate and support the son until he should be able to support himself. He also appointed her guardian of the son, and named a trust company as executor. The property left by the testator consisted principally of 5,200 shares of the capital stock of a copper mining company, which had been bought by him through, and was being carried on margin by, a firm of brokers who had a lien thereon at the date of the testator's death for several thousand dollars, and a dividend that had been declared on said stock which was subsequently paid to the brokers and credited to the testator's account. The executor, upon being informed of its appointment as such, filed a petition for the probate of the will, and asked the brokers to carry their account with the testator until letters were issued. They refused to do so unless the executor would guarantee the account, which it declined to do. The executor having been called upon to furnish further margin for the protection of the account applied for temporary letters of administration, which were issued. Later, the price of the stock having gone down, and the brokers having from time to time called for further margin, the executor applied to the surrogate for, and secured, an order permitting it to sell, after appraisal, the mining stock to reduce the estate to cash and pay off the brokers' claim. Pursuant to said order, after appraisal, the executor from time to time sold the stock, but received less therefor than the appraised value.

Evidence examined, and *held*, that it was discretionary with the executor as to the time within which it should sell the stock, and that such discretion was exercised fairly and with ordinary prudence;

That the executor should not have been surcharged with the market value of the whole number of shares which it was authorized to sell, as of the date on which it was informed of the appraisal thereof, and that it should be allowed its commissions and costs;

That although the widow has a life estate in the property of the testator, she is not entitled to possession thereof without giving security for the protection of her son's remainder.

CROSS-APPEALS by The Mercantile Trust Company, as executor, etc., and by Adelena Muhlenbach Smith, legatee, and Charles Stuart von Lutnow Smith, legatee, from parts of a decree of the Surrogate's Court of the county of New York, entered in the office of the clerk of said court on the 17th day of October, 1911, settling the account of The Mercantile Trust Company, as executor.

Allan McCulloh of counsel [W. W. Lancaster with him on the brief], Alexander & Green, attorneys, for the executor.

John S. Wise, Jr., of counsel [J. S. & H. A. Wise, attorneys], for Adelena Muhlenbach Smith.

John M. Harrington, for Charles Stuart von Lutnow Smith.

CLARKE, J.—The decree charged the trust company, as executor, with the net proceeds of the sales of 2,500 shares of Anaconda Mining Company stock actually sold, and with the value as of July 8, 1907, of 2,700 additional shares of such stock at $60.35 a share, although not sold at that time, nor at that price. Upon the sum of $64,265, the principal of the account as restated, the executor is charged with interest at four per cent from July 9, 1907, to June 10, 1909. From June 10, 1909, the decree charges the executor with interest at four per cent

on $62,598.71 principal and on $5,411.71 income. It charges the executor with the costs and disbursements of these proceedings and deprives it of its commissions on account of $38,632.-50 of principal and $4,934.15 of income.

The executor appeals from so much of the decree as surcharges it with the difference between what it actually received for the stock sold and what the court determined it should have sold it for, and if it is to be so surcharged, it appeals from so much of the decree as deprives it of its commissions thereon. The contestants appeal upon the ground that the executor should have been charged with the market value of the whole 5,200 shares of stock as of the 18th or 20th day of May, 1907, and with interest at six per cent upon the balance as stated as of that day, and from the allowance of any commissions. A further question is presented as between the contestants as to the nature of the estate as between the widow and the son.

The fundamental question is whether the executor had any discretion as to the time within which it should have sold the stock belonging to the testator, and if it had, whether such discretion was exercised fairly and with ordinary prudence.

On April 14, 1907, Charles Kessler Smith died in the city of New York, leaving a widow and a son. His will provided: " To my wife    *    *    *    the use and benefit of all the property real or personal of which I may die possessed I give to her for her natural life conditioned: that she shall educate and support our son Charles Stuart von Lutnow Smith until he shall be able to support himself. It being my intention that my wife shall during her life have the full enjoyment of all my property real and personal, I appoint her guardian of our son. On the death of my wife I devise and bequeath all my property to my son, *    *    *. It being my intention that on the death of his mother the property enjoyed by her during life shall become absolutely the property of my son." The Mercantile Trust Company was named as executor.

Testator left some trifling personal effects, $57.87 in cash, and 5,200 shares of the capital stock of the Anaconda Copper Mining Company that had been bought by him through, and was being carried on margin by, Harriman & Co., who had a lien thereon at the date of the testator's death to the amount of $257,999.05, and a dividend of $9,100 that had been declared on said stock on March 26, 1907, which was subsequently and on April 19, 1907, paid to said Harriman & Co. and credited to the account.

The first information of its designation as executor, and of the nature of the testator's estate, was received by the Mercantile Trust Company on April 15, 1907, when Oliver Harriman of Harriman & Co. delivered to its secretary said will and stated that the testator had been trading in Anaconda Copper Mining Company stock for years through said Harriman & Co. as his brokers, and that, so far as he knew, the testator's estate consisted of certain personal effects in a room uptown and 5,200 shares of Anaconda stock that were being carried in a speculative account on margin by Harriman & Co. and on which testator owed said Harriman & Co. about $250,000. On the same day the trust company ascertained the names and residences of the widow and next of kin, her residence being at Paris, France. A petition for probate was filed and citation issued on April seventeenth and made returnable June fourteenth. The officers of the trust company asked Harriman & Co. to carry said account until letters testamentary were issued. Harriman & Co. refused to do so unless the trust company would guarantee the account which it declined to do. On April nineteenth Harriman & Co. called on the trust company to furnish further margin for the protection of the account. On April twenty-second the trust company applied for temporary letters of administration which were issued on April twenty-fifth. As the price of Anaconda went down Harriman & Co. from time to time called for further margin and requested said

trust company to take up the account, and continued to call for further margin until about August 14, 1907.  Between April 14 and May 8, 1907, the price had varied from $59 to $65 a share.

On May eighth the trust company submitted a petition to the surrogate in which it said:  " That it is certain that jurisdiction of Charles Stuart von Lutnow Smith cannot be acquired until the term of publication of the summons is completed, to wit, until on or about the 1st day of June, 1907, and the grant of Letters cannot occur until after the return of said citation.   *   *   *   That the property of said decedent, so far as petitioner has been able to ascertain, consists wholly of 5,200 shares of the capital stock of Anaconda Copper Mining Company which are held by Messrs. Harriman & Company, brokers,   *   *   *   and which are of the present market value of about $63 per share, together with $18,300 dividends upon said stock, which are in the hands of said brokers.  Against the said stock and dividends the said brokers have a claim against the said decedent, which is a lien and charge upon said stock and all moneys in their hands amounting to about the sum of $257,400;   *   *   *   that as petitioner is informed and believes the stock market in the City of New York and elsewhere in the United States is in a fluctuating condition and that unless petitioner is authorized to sell said 5,200 shares   *   *   *   and reduce said estate to cash and pay off the debt or charge against the same in favor of Messrs. Harriman & Company, brokers, who hold said stock, the said estate may be wholly lost by a sudden fall in the price of said securities.  That in the event of a sudden fall in the market price of said stock the said Harriman & Company would have a right to sell said stock, as petitioner is informed and believes, to protect themselves and to liquidate their claim against said estate; that the present value of said stock and cash,   *   *   *   after deducting the amount of said Harriman & Company's account

or claim against the same, is about the sum of $77,000, but, as above stated, said value is liable to be increased or decreased by the fluctuation of the stock market.   *   *   *   Wherefore, your petitioner prays that an order may be made herein authorizing petitioner, as such temporary administrator, to sell after appraisal said 5,200 shares of stock   *   *   *   upon the New York Stock Exchange for the benefit of said estate, and authorizing your petitioner to liquidate and pay from the proceeds of said sale the account of Messrs. Harriman & Company with said estate, and the indebtedness of said estate to Messrs. Harriman & Company which is a charge and lien against said stock." On May fifteenth the surrogate entered an order, granting the prayer of said petition and ordering that the trust company, as temporary administrator, be authorized to sell at public auction on the New York Stock Exchange said shares after appraisal by an appraiser appointed for that purpose only ; and it was further ordered that the trust company, as temporary administrator, be authorized to pay from the proceeds of said sale the indebtedness of said estate to Messrs. Harriman & Co. which was a lien and charge against said stock.

The appraiser appraised the said 5,200 shares as of the death of Smith, April 14, 1907, and found that the market value on said date was $312,000, and he further appraised the market value as of the date of the appraisal, May seventeenth, at $325,000; that is, at $60 a share as of April fourteenth, and $62.50 as of May seventeenth. The trust company was informed of the appraisal on Saturday, May eighteenth. Between May 20 and July 9, 1907, it sold 2,500 shares. The stock sold in May, 1907, ran from sixty and one-eighth to sixty-two and five-eighths; in June from fifty-six and one-half to fifty-seven and three-fourths; in July from sixty and one-eighth to sixty-one and one-fourth. During August, 1907, from the fifteenth to the twentieth, 2,200 shares were sold from forty-four

and one-fourth to forty-six. After these sales the trust company had 500 shares on hand which it held until May 20, 1909, when they were sold between that date and the twenty-fourth from fifty and one-half to fifty and three-fourths. The sales aggregated $274,524, less the commissions at prices from sixty-two and five-eighths to forty-four and one-fourth.

Mr. Richards, the secretary of the trust company, testified: " We knew at that time what the market value of Anaconda Copper Mining stock was. I kept familiar with it in the course of my business. I saw the quotations every day. * * * The business of the trust company is composed to a great extent in loaning on collateral securities listed on the Stock Exchange and the men who are actively in charge of that matter keep in constant touch with the market, and I do also in a general way. And from watching the tape and the daily reports in the newspapers and the general feeling that existed at that time, in 1907, and talking it over with our executive officers was my source of information. * * * And also the common knowledge that we all have that copper mining stocks are subject to very wide fluctuations. Also that this stock had been selling up as high as 75, and in previous years was paying a 29 per cent dividend, in 1907, and in previous years had paid very little dividend, and then the change in the rates of dividend, and the peculiar conditions that existed during the year 1907, all caused us to feel that way. At the date of that verification [referring to the petition supra] the stock market in New York had been sagging off for some time; prices had been depreciating, and it was just prior—that is, in May, 1907, I should say, the feeling was beginning to be very uncertain. * * * We tried to get Mr. Harriman to carry the account until we could be appointed executor and get letters testamentary issued to us, and they refused to do so unless the Mercantile Trust Company as a corporation would guarantee the account, and that we refused to do, and they did keep call-

ing on us, and that is the reason we had to sell. * * * We ordered Harriman & Company to sell 500 shares. * * * It was Saturday morning when we got the order. * * * On May 20th, 1907, I directed Harriman & Company to sell 200 shares. * * * I did not on May 20th, 1907, direct that the balance of the stock remaining unsold, namely 4,700 shares, be offered for sale on the Stock Exchange. * * * The market suffered a very violent slump in [March], and it rallied somewhat in May. * * * The feeling generally was one of anxiety and uncertainty about prices. * * * At the last hearing I said I gave them [that is Harriman & Co.] an order to sell on a scale up. Q. Was that order unlimited in number of shares? A. No. Each day it was limited to a specific number of shares, because we felt it would be unwise to give orders to sell more than we thought would be sold without effecting a break in the market. I had always tried to get the $62\frac{1}{2}$ that the appraiser put on it, so we would give an order to sell so many shares, practically not more than 500, on the scale up, I mean $\frac{1}{8}$ up, so that if the market went up it would catch the order, and very often we would give an order to sell more shares than were actually sold. * * * I always gave directions to sell at a specific price or better. * * * When Mr. Harriman called at the office of the Mercantile Trust Company on the 15th of April, 1907, he told us, in response to my inquiry as to who Judge Smith was, that Judge Smith was a man who had been a specialist in Anaconda stock and had been trading in their office for some time, and that he confined his operations almost entirely to that particular stock, and that he had been dealing in the shares of the stock for some years."

Referring to the allegations in the petition for leave to sell, the witness said: "In my judgment there was not actually such condition at the time that we received authority to sell as is described in that paragraph. * * * The purpose of

the allegation was to procure an order to enable us to be in a position to sell the stock if a sudden drop occurred such as in the March previous, 1907, when there was a panic and the stock did drop very low, and with that in mind we wanted to be in a position to act quickly.   *   *   *   In the account or statement that I have filed, it appears that we made sales subsequent to those made on the 18th and 20th of May, 1907, at prices under the appraised value.   The occasion of making those sales was that the price of the stock kept continually dropping; the stock had been very high in the early part of 1907; February, I think, it was up somewhere like 75, and it dropped down in the March panic, and then recovered, and for a long time we tried to realize as near as possible the appraised price, but as it kept still further dropping we considered it was best to sell on reactions from the low prices and get the highest price that was obtainable under the circumstances.   *   *   * By trying and endeavoring to get better prices, I mean that if you watch the market closely it drops down every once in a while and reacts.   We tried to sell it on those reactions, on the upward movement.   *   *   *   I mean that we studied the swing of the market and tried to catch it.   *   *   *   These sales had to do with reference to the matter of the margin of the Harriman account, we had to keep—in the early stages of our trusteeship the dividends on the stock practically carried the stock; later on when the dividends were reduced, we were being called upon by Harriman for margin, and it was in order to keep the account good that we were obliged to sell some part of the stock.   On each of these sales which were made between the month of May and the month of September, 1907, all of the proceeds were retained by Harriman & Company against our indebtedness.   *   *   *   On the 14th of August, after the Standard Oil fine had been levied   *   *   *   a very unsteady condition prevailed and the matter was presented to our executive committee.   *   *   *   The matter referred to them was

the question whether it was desirable to any longer continue holding the shares or whether the account with Harriman & Company should be liquidated and Harriman paid off, and whether the stock ought to be sold at the prices that then prevailed, which were below the appraised value fixed by the appraiser appointed by the surrogate."

A resolution was adopted by the executive committee: " The vice-president, Mr. Poillon, reported that this company, as temporary administrator and as executor of the late Charles K. Smith, had sold 2,500 shares of the capital stock of the Anaconda Copper Mining Company at an average price of 60.35 and that there remained in the estate 2,700 shares, which, if sold at the present market price, about 46, less the amount due Messrs. Harriman & Company, would leave an equity in the estate of about $27,800, and, on motion, it was *Resolved:* That it is the sense of the Committee that sufficient shares be sold at the best price obtainable to liquidate the claim of Harriman & Company."

Following the passage of that resolution the trust company sold sufficient stock to liquidate the account of Harriman & Co., and upon that sale the claim was liquidated. It resulted in a small cash balance of $2,241.01 over and above the amount of the claim of Harriman & Co. being remitted to the trust company, together with 500 shares of Anaconda stock. Mr. Richards further testified: " The facts and circumstances which led up to our making the sale of this stock in 1909, were the fact that the * * * eighteen month's period in which we had to account as executor had just about expired, and the fact that the stock had had a material increase in the market value, leading us to believe that it was a favorable time to dispose of the stock and invest the proceeds in investments legal for trustees to invest their funds in. As a matter of fact, at the time we made the sale the stock had recovered from about

25 to 50. And the proceds that were realized from that sale we subsequently invested in bond and mortgage."

The decree directed that the costs and disbursements be paid by the Mercantile Trust Company and awarded costs to the other parties; it withheld from the trust company commissions upon the amount with which it was surcharged in the proceeding, to wit, $38,632.50 on account of principal, and $4,934.15 on account of income; allowed to the trust company commissions in the sum of $3,027.19 for receiving and paying out the balance of the principal of the estate, based upon the gross value of the stock after deducting the net amount with which it was surcharged on the accounting; allowed $169.37 for receiving and paying out the income; charged the trust company with interest at the rate of four per cent upon $64,265 from July 9, 1907, to June 10, 1909; credited the trust company with interest paid to Harriman & Co. at the rate of six per cent up to July 9, 1907, and with interest at the rate of four per cent upon several items between July 9, 1907, and June 10, 1909; directed payment to the widow of the balance of income in the amount of $5,411.70 as found, less commissions with interest at the rate of four per cent from June 10, 1909; directed payment to the widow of interest on $62,598.71, the principal of the estate as found as commissions at the rate of four per cent from June 10, 1909, to the date of payment, and directed the trust company to pay over to the widow the entire principal of the estate less commissions.

The trust company contends that it should be charged with only $23,966.21 as principal. The son, who became of age a few days after the surrogate's decree, claims that the trust company should be charged as of May 20, 1907, with the proceeds of the 500 shares that were sold on May 18, 1907, and with the fair market value on that day of the remaining 4,700 shares, or in any event they should be charged as of May 21,

1907, with the proceeds of the 700 shares and with the fair market value of the remaining 4,500 shares.

The referee found, without exception, " that the said trust company acted in good faith and had no motive of profit to itself in its conduct of this stock transaction for this estate."

But he also found: That the period ending July 8, 1907, was a reasonable time for said Mercantile Trust Company to sell all of the said 5,200 shares of said Anaconda Copper Mining stock.

That in not disposing of all of said stock prior to July 9, 1907, the said trust company failed to exercise reasonable prudence and diligence.

That by the exercise of reasonable prudence and diligence said trust company could have sold all of said 5,200 shares of said stock within the period ending July 8, 1907, for sixty dollars and thirty-five cents a share.

The trust company bases its exceptions upon the propositions: (1) That what is a reasonable time within which securities should be sold depends upon the circumstances of each case; (2) that by virtue of its position as personal representative of the Smith estate, in the first instance as temporary administrator and subsequently as executor, it had discretion to determine when the stock composing the estate could be sold at an honest price, and (3) that if it acted with the diligence and prudence of a prudent and intelligent man in the management of his own affairs in determining when the stock could be sold at an honest price and in selling the stock within that period, the sale was made within a reasonable time, and the trust company was not liable to the estate for any loss which may nevertheless have resulted. In other words, the trust company contends that its liability, if any, must be predicated upon negligence, and should it show that it prudently and diligently endeavored to sell the stock, that it managed the estate with a view to selling and obtaining the fair market value of the stock

in view of the circumstances, then it was not negligent, and the time within which it in fact sold the stock must be deemed to be reasonable.   The officers of the trust company considered the stock cheap at sixty-two and a half and that if the dividend rate continued the stock would sell considerably higher.

The trust company was in communication with Mrs. Smith's counsel, who held a power of attorney from her, and endeavored to get the views of such counsel as to the best method to liquidate the account.   While counsel did not assume to advise the trust company, they said they hoped the trust company would endeavor to so handle the account as to realize the best possible price for the stock and that they hoped that an average price of sixty-two would be realized.   The trust company consulted with Mr. Harriman, but he wanted the margin kept up or the account closed, and declined to advise as to holding or selling the stock, and his firm made a number of calls for more margin in April, May and subsequently.

In disposing of the stock as it did the trust company did what in the judgment of its officers was for the best interests of the estate.

A remarkable parallel exists in the facts in *Matter of Weston* (91 N. Y. 502) and in those in the case at bar.   In the *Weston* case testator had bought outright 1,000 shares of a certain railroad stock in August and September, 1872, at about fifty-nine, and later 500 shares on margin which were being carried by his broker.   In January, 1873, the stock had sold at ninety-four, but had fallen to eighty-five at the time of his death, May 7, 1873.

In the case at bar testator had commenced to purchase in January, 1906, at sixty-seven dollars and fifty cents, had seen it drop to fifty-eight dollars and twenty-six cents when he purchased in June, 1906; he made another purchase in September at seventy-two dollars and seventy-seven cents and made his last purchase in March, 1907, at seventy-one and seven-

eighths dollars. At the time of his death it was sixty dollars, all was on margin and all that he had was invested therein. In the *Weston* case Judge FINCH said: " It must be granted that the stock was somewhat of a dangerous and speculative character, subject to great and sudden fluctuations of value, and not such as a trustee could select for an investment of trust funds without responsibility for a loss. But the executors did not make this investment. They found the stock among the assets. Without their fault it came upon their hands and they had to care for and dispose of it, with all its inherent risks on the one hand and possibilities on the other. That the testator thought well of it they had ample evidence." So in the case at bar the evidence was that the testator was a man who had been a specialist in Anaconda stock, had been trading in it for some time, had confined his operations to that particular stock. In the *Weston* case the court said: " He, therefore, had held it firmly on a falling market." That is equally true here. From his first purchase in January, 1906, until his death testator sold none of the stock and held it even through the panic of March, 1907.

In the *Weston* case letters testamentary was granted on the 6th of June, 1873. The court said: " The judgment and discretion of the executors was then called into play, for it was possible to sell the stock at once for about 80. Should they do so, or wait, was the important inquiry, to be answered with sole reference to the welfare of the estate committed to their care. They consulted and took the best advice attainable and determined to wait. The stock had been above par the year before, and under all the circumstances, with the advice and example of the testator both before them, and their own justifiable confidence in the value of the stock it is quite certain that their conclusion was reasonable and their delay excusable."

In that case the price of the stock continued to fall and

after a delay of three months there was a panic and the depression continued during the remainder of the year when there was a recovery to a certain extent. Then came another heavy fall; in April, 1874, the stock dropped to thirty and in June of that year, when their inventory was filed, it was appraised at twenty. The court said: " There is, and there can be, no rigid and arbitrary standard by which to measure the reasonable time within which the discretion of an executor directed to convert an estate into money must operate. &ast; &ast; &ast; In this State, at all events, there is no arbitrary standard. The executor, here, cannot be compelled to account until after eighteen months; and yet it may be his duty to sell even earlier than that, or to wait even longer, according to the circumstances of particular cases and the exigencies which exist. &ast; &ast; &ast; The test must remain, the diligence and prudence of prudent and intelligent men in the management of their own affairs. (King v. Talbot, 40 N. Y. 76; Thompson v. Brown, 4 Johns. Ch. 627; McRae v. McRae, 3 Bradf. 199.) Stocks of variable value ought not to be timidly and hastily sacrificed, nor unwisely and imprudently held. Even where there is a direction to sell, reasonable time must be given, and what that is must be determined in each case by its own surroundings."

From the report of the Anaconda Company for the year 1906 it appeared that the company was capitalized at $30,000,000 composed of 1,200,000 shares of the par value of $25 each, and that after the payment of all charges the balance which was carried to the balance sheet of that year amounted to $8,842,-669.54. In 1905 eleven and one-half per cent dividends had been paid; in 1906 nineteen and one-half per cent; in 1907 twenty-six per cent. Copper was selling at from twenty-five cents to twenty-six cents per pound. The referee found, without exception, that the said trust company acted in good faith and had no motive of profit to itself in its conduct of this stock transaction for this estate.

Acting upon the best information and advice it could obtain, placing its orders in the most careful manner and in entire good faith, it made the 'sales alluded to. The referee found that the entire period from May eighteenth to July eighth was a reasonable time within which to sell said stock. But there were but nine days within that period upon which the price of sixty dollars and thirty-five cents was reached. On May twenty-first, when the sales on the market increased to 12,500 shares, sixty-one and one-eighth was the high price, but fifty-eight was the low; but the trust company was only able to dispose of 200 shares at the higher price and so on from day to day the actual sales made seem to have been at the best market price. As they were only able to dispose of a small portion of their order at the best prices, it is entirely reasonable to suppose that if their entire holdings had been thrown upon the market the price would have been very much depressed. If the referee's conclusion is justified, that the period of reasonable time expired on July 9, 1907, it would seem to be as reasonable for the trust company to credit itself with the unsold 2,700 shares at fifty-four and one-half, which price prevailed for half of the month of June as well as for sixty dollars and thirty-five cents, which has been charged, and a price which it was not able to get.

We think the rule is established by the *Weston* case in this State. Applying that rule we think the trust company which had been appointed executor for the purpose of exercising its discretion, exercised the diligence and prudence of prudent and intelligent men in the management of their own affairs. Either such discretion was vested in it or it was required, as claimed by counsel for testator's son, to sell all the stock upon the day it received authority to sell. But this is not the rule. As said in the *Weston* case: " It is easy to see now that it would have been wiser to have sold, and had the executors known then what they and we know now, they would undoubtedly have done

so. But they did not and could not know. The indications pointed to an eventual restoration of value and we cannot say that it.was imprudent or unwise to expect and wait for it."

Contestants place much reliance on Matter of Hirsch, No. 1 (116 App. Div. 367; aff'd., 188 N. Y. 584). In that case this court said: " Certainly common prudence required that such a speculation should be closed out at the earliest practicable moment, and the income from the property secured to the beneficiaries, and not exposed to the perils of continuing such a speculation." But that was in a proceeding to remove the trustee and executor and to revoke his letters, and his conduct in holding the shares of stock for the purpose of controlling the company, having himself elected president thereof at a large salary, and other matters of that kind, presented a peculiar state of facts in no way resembling those at bar. This court also said: " There is no question here as to the liability of the appellant and his co-executor for the losses incurred in consequence of continuing the speculation, and we do not wish to be understood as expressing any opinion upon that question. What has been said relates solely to the question as to whether or not the surrogate was justified from the evidence before him in revoking the letters testamentary issued to the appellant and removing him as trustee." It was not intended in that case to change the rule established by the *Weston* case upon a state of facts to which it could appropriately be applied.

The main object of obtaining the order permitting the sale was to enable the trust company to liquidate the claim of Harriman & Co., and to remove their lien and to obtain possession of as much of the stock as possible. When that had been accomplished 500 shares were turned over to the trust company. There is no propriety in criticising its conduct as to these shares. It held them through a period of great depression, when they dropped as low as twenty-five, and they were finally sold at the end of the eighteen months at fifty and one-

half to fifty and three-fourths, double the price the stock sold for in October, 1907, and considerably in excess of the prices prevailing at the time of the liquidation of the Harriman claim on August 20, 1907.

Careful examination of this record has convinced us that the finding of good faith was absolutely justified and that the trust company should not have been surcharged but its account should have been passed as rendered. This will necessarily require the allowance of its commissions and its costs.

There is a question presented under the will of testator. We conclude that a life estate was given to Mrs. Smith. In view of the characer of the estate as personal property, and as she is a non-resident we think that she is not entitled to possession of the fund without giving security to protect her son's remainder interest.

It follows, therefore, that the decree appealed from should be reversed, with costs to the Mercantile Trust Company, payable out of the fund, and the matter remitted to the surrogate to enter a proper decree in accordance with the views expressed in this opinion.

INGRAHAM, P. J., McLAUGHLIN, LAUGHLIN and SCOTT, JJ., concurred.

Decree reversed, with costs to Mercantile Trust Company, to be paid out of. the fund and matter remitted to surrogate as directed in opinion. Order to be settled on notice.