1. EXECUTORS AND ADMINISTRATORS (§ 504*)—ACCOUNTING—CHARGES—VALUE OF ASSETS.

That executors in their account charged themselves with corporate stock at less than its true value was immaterial, where most of the legatees had filed a consent to its distribution in kind, and the executors had the stock in their possession and were in a position to make such distribution, as the price at which it was charged in their account only affected their commissions.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 2157–2167; Dec. Dig. § 504.*]

2. EXECUTORS AND ADMINISTRATORS (§ 326*)—DISTRIBUTION OF ESTATE—POWER OF SALE.

Under a will dividing testator's personal property, after payment of his debts and expenses of administration, into 42 equal parts, and bequeathing to each legatee a certain number of these parts, and empowering the executors in their discretion to retain any investment which the testator might leave, and to convert, reinvest, and make investments in any kind of securities they might approve, the executors had a right to sell the personal property for purposes of administration, in the absence of an application for its distribution in kind under Code Civ. Proc. § 2744, providing that the decree of distribution may direct the delivery of personal property in lieu of its money value, where all the parties interested file a consent to such distribution, or where it appears that a sale thereof for the purpose of payment of distribution would cause a loss to the parties interested, since executors have, for purposes of administration, an administrative title to all the personal property not specifically bequeathed, directly or by necessary implication, by virtue of which title they may sell personal property for the purpose of paying debts and expenses of administration and distributing the residue, unless it is apparent from the language of the will that the testator intended a distribution in kind.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. § 1343; Dec. Dig. § 326.*]

3. EXECUTORS AND ADMINISTRATORS (§ 118*)—SALES OF PERSONAL PROPERTY—VALIDITY.

A testator at the time of his death owned 7,969 shares of the common stock and 11,075 shares of the preferred stock of a corporation, organized to take over a business formerly conducted by him, and the estate subsequently acquired 5,000 shares of the preferred stock, but did not hold a controlling interest. The stock was not dealt in on public exchanges. The ratio of the corporation's assets to its liabilities was only 1.42 to 1, and note brokers, through whom it had borrowed large amounts of money, informed the executors that unless more capital was procured, so as to increase this ratio, they would be unable to dispose of the corporation's paper and would discontinue its account, and there was testimony that this would have seriously affected the corporation's credit. The executors were unable to find a purchaser for the common stock at the price at which they offered it, and declined an offer of $30 a share on certain conditions, but subsequently accepted an offer of $27 a share from a merchant of high financial standing, who agreed to invest $1,000,-000 in the company's preferred stock, thereby increasing the value of the estate's holdings of preferred stock. *Held*, that this sale of the stock was not imprudent, though it was claimed that the stock was worth $110 a share, especially as it is the best bid which fixes prima facie the selling value of corporate stock.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 472–482; Dec. Dig. § 118.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. EXECUTORS AND ADMINISTRATORS (§ 118*)—SALES OF PERSONAL PROPERTY —VALIDITY.

The conduct of executors in selling the assets of the estate cannot be characterized as imprudent merely because in the light of subsequent developments it might have been more advantageous to the .estate if the sale had been deferred, the test being whether their conduct at the time was such as would be adopted by men of ordinary prudence and intelligence in the conduct of their own business.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 472–482; Dec. Dig. § 118.*]

5. EXECUTORS AND ADMINISTRATORS (§ 475*)—ACCOUNTING—CHARGES—IMPROPER DISPOSITION OF ASSETS.

Where executors, without any satisfactory reason, agreed that the account of one of the executors with a corporation to which he was indebted should be credited, and the account of the estate to which the corporation was indebted debited, with a specified sum, thereby substituting the estate, instead of the corporation, as the executor's creditor, their account would be surcharged with the amount of the corporation's indebtedness to the estate, not paid by reason of such agreement.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. § 2061; Dec. Dig. § 475.*]

6. EXECUTORS AND ADMINISTRATORS (§ 466*)—DISTRIBUTION OF ESTATE—AGREEMENTS BY LEGATEES—EFFECT.

Where executors entered into an agreement by which the estate was substituted, instead of a corporation indebted. to it, as the creditor of one of the executors, an instrument executed by a number of the legatees, directing the executors to release and discharge the debtor executor from the payment of such indebtedness and to charge the interest of each subscriber with his or her pro rata share of the sum so released, did not warrant the executors in releasing their coexecutor, nor justify them in deducting from the shares of the subscribers their pro rata share of the indebtedness, as it was executed for the purpose of releasing the coexecutor's indebtedness to the estate, and not to release the executors from their liability to pay the legatees their full shares, and unless they filed consents that their respective shares might be diminished by their proportionate share of the indebtedness, such instrument would be disregarded.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 1993–1995; Dec. Dig. § 466.*]

7. PRINCIPAL AND AGENT (§ 85*)—REIMBURSEMENT OF AGENT FOR EXPENSES.

An executor who, in the testator's lifetime, purchased corporate stock in his own name as agent for the testator, who paid therefor, was entitled to reimbursement for the expense of defending an action against him by the receiver of the corporation, growing out of the stock subscription.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 224–228; Dec. Dig. § 85.*]

8. EXECUTORS AND ADMINISTRATORS (§ 511*)—ACCOUNTING—COSTS.

Where the objections to an executor's account were material, and raised questions of considerable importance, which were not entirely free from doubt, the costs of a reference should be paid by the estate, and not charged against the contestants.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 2257–2266; Dec. Dig. § 511.*]

Proceeding for the judicial settlement of the account of Edward H. Titus and others, as executors of Edward P. Hatch, deceased. On motion to confirm the report of a referee. Report modified and confirmed.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Nelson S. Spencer and Otto C. Weirum, Jr., both of New York City, for Wilson Hatch Tucker and Samuel H. Ordway.

Dean Sage, of New York City (George Zabriskie, of New York City, of counsel), for contestants.

Henry G. Gray, of New York City, for claimant Edward H. Titus.

Henry Amerman, of New York City, for John S. Amerman.

Bacchus & Demarest, of New York City, for Chas. H. Behrman.

L. & J. Weinberger, of New York City, for Edward E. Buller.

Rollins & Rollins, of New York City, for Lewis De Groff & Son and Windsor Trust Co.

Barber, McGuire & Ehlermann, of New York City, for Empire Trust Co.

George B. Glover, of New York City, for Gertrude M. Smith.

Loren H. Harter, of Brooklyn, for Coombs & Wilson.

Wilfred H. Warner, of New York City, for Wm. Forger and Mamie F. Baker.

Charles W. Sinnott, of New York City, for Paul Hertwig.

Gould & Wilkie, of New York City, for Lord & Taylor.

William O. Morgan, of New York City, for Edward A. Hendrickson.

Geller, Rolston & Horan, of New York City, for Real Estate Title Ins. & Trust Co. of Philadelphia and others.

C. H. & J. A. Young, of New York City, for William T. Quinn.

George W. Titcom, of Brooklyn, for Brooklyn Taxicab Co.

Maurice L. Shaine, of New York City, for Morris Jasper.

Murray, Prentice & Howland, of New York City, for Equitable Trust Co.

Paul Jones, Jr., of New York City, for Lucia P. Tucker and others.

Patterson & Brinckerhoff, for Frank Hibl.

Robert M. Boyd, Jr., of New York City, for Charles W. Anderson.

Duer, Strong & Whitehead, of New York City, for William G. Phillips.

FOWLER, S. The motion to confirm the report of the learned and painstaking referee has been resisted with such minuteness and wealth of authority as to present almost every fact found by the referee and conclusion reached by him for review by the surrogate. The oral arguments alone consumed some sessions of this court, and the briefs subsequently submitted by counsel are elaborated and careful beyond precedent in my experience here. I can only hope that, after so much industry and care on the part of counsel, I apprehend and appreciate the force and scope of the various contentions submitted to me. If I do not review them all in detail, it is because I am persuaded that it is unnecessary for me so to do, not because I have overlooked them.

One question is most prominent—the validity of the sale by the executors of the common stock of the Lord & Taylor corporation coming into their hands as executors. The facts more pertinent to the contention are that the testator died on the 20th of September, 1909. His will was duly admitted to probate by this court, and letters testamentary were issued to Edward H. Titus, Wilson H. Tucker, and Samuel H. Ordway, the executors named in the will. These executors have

since filed an account of their proceedings, and legatees representing $^{25}/_{42}$ of the personal estate filed objections to the account. The matter was then referred by this court in the regular course of procedure to a referee to hear and determine the questions raised by the objections to the account. The referee having filed his report, the executors and certain of the legatees have filed exceptions to his findings, and the sufficiency of these exceptions is now before the court for its determination.

Objections to the account of the executors are, first, that the executors have charged themselves with 16,075 shares of the preferred stock of Lord & Taylor, a domestic corporation, at $75 a share, whereas its true value is $100 a share; second, that the executors have charged themselves with the proceeds of the sale of 7,969 shares of the common stock of Lord & Taylor at $27 per share, whereas the true value of the stock is $110 a share.

[1] The first objection becomes immaterial, in view of the fact that the executors still have in their possession all the preferred stock of Lord & Taylor which the decedent owned at the time of his death, and to which his estate subsequently became entitled. The legatees representing $^{39}/_{42}$ of the estate have filed a consent that this stock be distributed in kind, and as the executors are in a position to make such distribution the price at which they appraised it in their account is material only upon the question of their commissions. As the appraised value is less than the value placed upon the stock by the objectants, the findings of the referee upon the issues raised by this objection are sustained.

The second objection raises two questions: First, whether the will conferred upon the executors the power to sell the common stock; second, if they had such power, whether in selling it at $27 a share they acted with that prudence and intelligence which prudent men exercise in the conduct of their own affairs.

[2] The determination of the first question requires an interpretation of the will of the testator, for the purpose of discovering his intent as to the manner in which his estate should be distributed among his legatees. The will of the testator, after directing the payment of certain small legacies, provided as follows:

"Sec. 3. I divide the balance of my personal estate into forty-two equal parts, and of said balance I give and bequeath (a) six forty-seconds to my son Edward Hatch; (b) ten forty-seconds to my daughter Cornelia G. Hatch; (c) ten forty-seconds to my grandson Wilson Hatch Tucker; (d) three forty-seconds to Mary E. Bell; (e) three forty-seconds to Lucia P. Ames; (f) three forty-seconds to Jane W. Hendrickson; (g) three forty-seconds to the children of Harriet L. Titus, deceased; (h) four forty-seconds to the children of my son Edward Hatch."

There is also a residuary clause by which the residue of the estate is bequeathed to his son Edward Hatch, his daughter Cornelia C. Hatch, and a grandson, Wilson Hatch Tucker.

Section 9 of the will reads as follows:

"I empower my executors, in their discretion, to retain any investment and investments which I may leave, to convert, reinvest and make investments of any funds entrusted to them under this will in any kind of securities they may approve. * * *"

The testator, it will be observed, does not direct his executors to deliver to the legatees any specific property. He merely directs that his personal property shall be divided by his executors into 42 parts, and then he bequeaths to each of the legatees a certain number of those parts. It may well be that some of his personal property could not be divided into 42 equal parts. The number of shares of stock held by testator in the Lord & Taylor corporation could not be divided into 42 equal parts without including a fraction of a share in each part, and as the shares are not issued in fractions such a complete division would be practically impossible. The personal estate to which the testator refers in section 3 of his will is that part of his estate which would remain after the payment of all debts and administration expenses. Not having directed his executors to appropriate any particular part of his personal property for the payment of debts and expenses of administration, he could not have foretold what part of it would be sold for this purpose. It is improbable, therefore, that he intended that any particular shares of stock should constitute the personal estate which he directed to be divided into 42 equal parts.

Unless such personal estate was capable of division and delivery in kind, and such division and delivery were contemplated and intended by the testator, the legacy would not be specific, and the executors would have the naked right, in my opinion, to sell the personal property for purposes of administration. That part of section 9 of Mr. Hatch's will empowering his executors to *retain* any investments which he might leave and to convert them into cash indicates that he did not intend by section 3 specifically to bequeath to each of the legatees therein mentioned a particular fractional part of the shares of stock or other personalty which would constitute his personal estate, because if, by section 3, he had intended to make specific bequests to the legatees, there would be no occasion for his giving in section 9 a power to his executors to retain such investments. If the testator had intended by section 3 specifically to bequeath the various forty-second parts into which he directed that his estate be divided, it must be assumed that he was aware that his executors would have to retain them for the purpose of delivering them to the legatees, and there would be no occasion for granting them the power conferred by section 9.

Executors have, for purposes of administration, an administrative title to all the personal property not specifically bequeathed either directly or by necessary implication. The tendency of modern law is to enlarge the administrative title of the executors of a will, not to restrict it, although express statutes may modify this tendency in some states. By virtue of their administrative title it has been long laid down in this state that executors may sell the personal property of their testator for the purpose of paying the debts of the estate, the expenses of administration, and distributing the residue among the legatees in the proportions prescribed by the will. 2 Williams on Executors (7th Am. Ed.) p. 120; Mills v. Hoffman, 26 Hun, 594; Matter of N. Y. Life Ins. & Trust Co., 86 App. Div. 247, 83 N. Y. Supp. 883; Matter of Hunt, 110 App. Div. 533, 97 N. Y. Supp. 403; Sherman v. Willett, 42 N. Y. 146. This general executorial power of sale of personal property for purposes of distribution may doubtless be limited by the testa-

tor, and whenever it is apparent from the language of a will that the testator intended that his personal property should be distributed in kind among the legatees, the executor will not be permitted to sell such property and distribute the proceeds.

Under section 2744 of our Code of Civil Procedure personal property may be distributed in kind where all the parties interested file a consent in the Surrogate's Court that such distribution be made, or where it appears that a sale thereof for the purpose of payment or distribution would cause a loss to the parties interested. If, as contended by the contestants, it were the law of this state that the right of an executor to sell the personal property bequeathed by his testator was limited to so much of the property as was necessary for the payment of debts and administration expenses, and that the remainder of the property should be distributed in kind, there would have been no need for the enactment of section 2744 of the Code. That section was enacted to enable the legatees, under the circumstances therein mentioned, to prevent executors from exercising their recognized right of sale for purposes of distribution. It is therefore manifest that, when personal property is not specifically bequeathed, the executor may sell such property and make distribution of the proceeds among the legatees, unless they make an application to the court under section 2744 for distribution in kind. As the testator did not specifically bequeath all his personal estate the executors had the right to sell that part of it which constituted the 7,969 shares of the common stock of Lord & Taylor.

[3] But it is contended by the objectants that, even if the executors had the power to sell the testator's personal property, their sale of the Lord & Taylor common stock at $27 a share was a careless and negligent exercise of that power, as the actual value of the stock was $110 a share. It is difficult to determine the value of a corporate stock of this character until a bona fide sale actually made. This has been said by the English common-law judges, and in this view I concur. It is the best bid which fixes prima facie the selling value, and the best bid will be influenced by many considerations affecting the solvency and the future of the corporation. Mr. Hatch was the life and soul of the business of Lord & Taylor, and his death must have had some detrimental effect on the value of its stock. Value is an economic problem conditioned by a great variety of circumstances.

Much testimony was taken before the referee as to the circumstances which led up to the sale of the stock in question. It appears from such testimony that Lord & Taylor, a domestic corporation, was organized in 1904. It took over the business theretofore conducted by the testator under the name of Lord & Taylor. The capital stock was $5,500,000, of which $3,000,000 was common and $2,500,000 preferred. The testator at the time of his death owned 7,969 shares of the common and 11,075 shares of the preferred. The estate subsequently acquired 5,000 shares of the preferred. The estate did not hold a controlling interest in the company. The stock in question was not the stock of a great public corporation, dealt in on public exchanges, but the stock of a business corporation, the continued prosperity of which was essential for all owners of its stock and to the sale of such stock.

At the time of the testator's death the company owed over $3,000,000 on commercial paper outstanding in the hands of banks of discount. It was also indebted to the testator in the sum of $511,000, and to other individuals in about $1,000,000.

In the balance sheet of the company for January 31, 1910, the ratio of assets to liabilities was only 1.42 to 1. Financial institutions in the business of lending money to commercial borrowers usually require that the ratio of assets to liabilities shall be 2 to 1. This, to my mind, was a very serious situation for the executors to confront. It appeared that for many years prior to the death of the testator the company had habitually borrowed large amounts of money on its notes of hand. These notes were usually handled by a prominent firm of note brokers, who sold the notes to the banks in the usual course of business. The brokers also frequently advanced to Lord & Taylor large sums of money on the notes before succeeding in disposing of them. About the 21st of January, 1910, the note brokers informed the executors that it would be necessary for them to procure more capital for the company, and in the event of the company's failure to increase the ratio between their assets and liabilities that the brokers would be unable to dispose of their paper, and would ask them to discontinue the company's account. It appeared from the testimony taken before the referee that if the brokers refused to dispose of the paper of the company, or refused to continue to handle the account, the effect upon the credit of the company would be very serious and might even result in a receivership.

The precarious condition of the company's credit induced the executors to endeavor to dispose of the testator's holdings of stock in the company for the general advantage. They entered into negotiations with various possible purchasers for the sale of the common stock, but were unsuccessful in finding a purchaser who would take it at the price offered. An offer of $30 a share on certain conditions was declined by the executors. Subsequently they accepted an offer of $27 a share, the purchaser agreeing to invest $1,000,000 in the preferred stock of the company. The company certainly needed strengthening, and this investment of $1,000,000 materially increased the value of the estate's holdings of preferred stock. The purchaser was a merchant of very high financial standing in the business community. His accession and future interest in its affairs was a distinct gain for the business corporation. By stress of circumstances the stock in the hands of the executors had become a unit. The augmentation in value of the preferred stock inured to the benefit of the estate, and the common stock could not be really injured by an appreciation in the value of the preferred.

[4] It may be, as the contestants contend, that the executors could have held on longer and retained possession of the stock until a more favorable proposition for its purchase was made to them, and it may be that they were unduly alarmed as to the possible consequence of the note brokers' threatened abandonment of sales of the company's paper; but the court cannot take into consideration possibilities which are merely speculative, nor can it characterize the conduct of the executors as imprudent under the circumstances disclosed merely because

in the light of subsequent developments it might have been more advantageous to the estate if the sale had been deferred to a later period. Matter of Weston, 91 N. Y. 502; Matter of Mercantile Trust Co., 156 App. Div. 224, 141 N. Y. Supp. 460, affirmed 210 N. Y. 83, 103 N. E. 884; Marsden v. Kent, L. R. 5 Ch. Div. 598. The criterion by which the conduct of the executors is to be determined is: Was it such conduct at the time as would be adopted by men of ordinary prudence and intelligence in the conduct of their own business? King v. Talbot, 40 N. Y. 76; Thompson v. Brown, 4 John. Ch. 627; Matter of Mercantile Trust Co., supra. A careful perusal of the testimony taken before the referee leads me to the conclusion that the executors, in selling the shares of common stock of Lord & Taylor at $27 a share, in the manner they did, acted intelligently and prudently, under the circumstances disclosed, and that their conduct in the transaction was that of prudent and intelligent business men. I will therefore sustain the findings of the referee on this point.

[5] Upon the hearing before the referee one of the executors, Mr. Edward H. Titus, attempted to show that an alleged indebtedness of the said Titus to the estate, amounting to $58,443, should not be charged against him or set off against his interest in the estate. The executors Tucker and Ordway except to the referee's refusal to set off Titus' indebtedness against his interest in the estate, as well as his refusal to grant relief against the beneficiaries who signed the paper of July 18, 1910, by charging their shares of the estate with certain proportions of Titus' debt which they agreed to bear. On July 31, 1909, the books of Lord & Taylor showed that Titus was indebted to the company in the sum of $58,443. Subsequently to the death of the testator, and about October 31, 1909, the executors of the estate consented that the account of Titus with Lord & Taylor be credited, and that the testator's account be debited, with that sum. The effect of the transaction was that the testator was substituted for Lord & Taylor as the creditor of Titus in the sum of $58,444.33. Titus thereupon pledged with his coexecutors certain stock as collateral security for the payment of his indebtedness to the estate. In their inventory the executors state that the indebtedness of Lord & Taylor to the estate was $510,994.26. In their account they state that they have received $452,549.93, with interest, from Lord & Taylor, and that they have a claim against Titus in the sum of $58,444.33. The executors therefore paid the indebtedness of Titus to Lord & Taylor out of the assets of the estate. The record contains no satisfactory reason for this transfer of indebtedness, and there appears to be no justification for the action of the executors. It was no part of their duty as executors to pay from the assets of the estate the individual indebtedness of one of their number. If the indebtedness of Titus was really an indebtedness of the testator, that question should have been litigated and determined before the executors paid it out of the assets of the estate and charged the payment against the account of the executor Titus. This action on the part of the executors was not necessary to the proper administration of the estate, and was, in my judgment, unwarranted. Their accounts will therefore be surcharged with the amount of $58,443.

[6]. On July 18, 1910, legatees representing $41/70$ of the estate, by

an instrument in writing, directed the executors to release and discharge the said Titus from the payment of the said indebtedness, except the sum of $16,500, and to charge the interest of each subscriber with his or her pro rata share of the sum so released. As all the legatees did not join in this request the executors would not be warranted in releasing their coexecutor Titus. Besides, the legatees who did not join are entitled to their share of the estate with the item of $58,444.33 included as an asset. The instrument signed by the legatees for the purpose of releasing Titus from his indebtedness to the estate would not now justify the executors in deducting from the respective shares of such legatees their pro rata share of the sum of $58,444.33, as that instrument was executed for the purpose of releasing his indebtedness to the estate, and not releasing the executors from their liability to pay the legatees their full shares. These legatees may, however, consent that their respective shares be diminished by their proportionate share of the $58,444.33, and such consent and release of the executors would justify the latter in making distribution accordingly. Unless the legatees file such a release before the settlement of the decree to be entered on this decision, the executors, in making distribution of the estate, will disregard the instrument already filed.

[7] The executors Tucker and Ordway also except to the referee's finding that the executor Titus be reimbursed for the expense of defending the action brought against him by one Hamilton, as receiver of Evans, Munzer, Pickering & Co. The record shows that on the 23d of April, 1902, the testator authorized Edward H. Titus to subscribe for 100 shares of the preferred stock of a customer, known as Evans, Munzer, Pickering & Co. The shares of this corporation were issued to Titus, but they were paid for by Lord & Taylor. The shares were subsequently redeemed by Evans, Munzer, Pickering & Co., and their check, which was made payable to Titus, was indorsed by him to Lord & Taylor. At that time the testator was the sole owner of the business conducted under the name of Lord & Taylor. It was not a copartnership and had not yet been incorporated. Mr. Titus did not purchase the shares of Evans, Munzer, Pickering & Co. for his own account. He acted as agent, and as Lord & Taylor were not then a legal entity or personality, Mr. Titus must have acted as the agent of the testator, who was then the sole owner of the business. Mr. Titus, therefore, had a right to ask the executors of Mr. Hatch to employ counsel to defend him in the action brought against him by the receiver of Evans, Munzer, Pickering & Co., and if as vouchees they failed to do so, and Mr. Titus was compelled to employ counsel to conduct the defense, the executors should reimburse him for the reasonable amount paid to such counsel. As the action against Mr. Titus is still pending, the executors should, I think, retain sufficient funds to pay any judgment which may be rendered against him by reason of the premises.

[8] The executors, Messrs. Tucker and Ordway, ask that the costs of the reference be taxed against the contestants. The objections filed by the contestants were material and raised questions of considerable importance. These questions were not entirely free from doubt. The objections, therefore, were neither capricious nor unsubstantial, and the contestants should not be charged with the costs of the reference.

Those costs should be paid by the estate. Matter of Edelmeyer, 157 App. Div. 773, 142 N. Y. Supp. 726.

The right of the executor Titus to employ counsel and to have the remuneration of such counsel paid out of the estate will be determined upon the settlement of the decree and the taxation of costs.

Except as modified by this decision, the report of the referee is confirmed. Submit decree and tax costs on notice.