In the Matter of the Final Accounting of HORACE GRAY et al., Executors, etc., of the Estate of RICHARD WARREN WESTON.

There is no rigid or arbitrary standard by which to measure the "reasonable time" within which an executor, directed to convert an estate into money, may exercise his discretion, and beyond which he may not delay in complying with the direction ; what is a reasonable time must depend upon the circumstances of each particular case.

*It seems* that where no special modifying facts are shown to shorten or lengthen the reasonable time, the period allowed before the executor can be compelled to account, *i. e.*, eighteen months, may serve as a just standard.

Among other assets left by a testator, which, by the will, his executors were directed to convert into money, was an interest in certain real estate which was incumbered by mortgages. The executors failed to sell; they paid off the incumbrances and expended further sums of money for taxes, and in the care and preservation of the property. A large proportion of said expenditures were after the expiration of the eighteen months. In the executors' accounts the items of payment upon the mortgages were entered as debts allowed and paid in a statement of "moneys paid, * * * to the creditors of the deceased." Certain contestants, among whom were infants, who appeared by special guardian, filed specific objections to the accounts. No objection was stated to the payment of the mortgages. The accounts were sent to an auditor; after the close of the evidence before him, the adult contestants stated that they would not press any objections to the accounts, in

respect to said property. The guardian for the infant contestants filed no exceptions to the auditor's report, the adult contestants did; the surrogate decided that the notice given the auditor was equivalent to a withdrawal of all objections as to said expenditures. *Held* no error.

The adult contestants appealed, the special guardian did not. *Held,* the objection that the infants did not join in the notice, and so were not bound thereby, could not be urged upon the appeal; that the adult contestants were bound by their own action, and the infants by the decree which, as they had not appealed, was conclusive as to them.

The repeal by the act of 1880 (Chap. 245, Laws of 1880) of the act of 1870 (Chap. 359, Laws of 1870) in relation to the powers and jurisdiction of the surrogate of the county of New York did not affect the power of said surrogate to "grant allowance in lieu of costs" given by the former act in proceedings pending before him at the time the repealing act took effect.

In proceedings so pending *held,* that the surrogate could not exceed the maximum amount limited by the Code of Procedure (§ 309); also that, although the costs were taxed after the Code of Civil Procedure without. effect, they were not affected by its provisions, as by it (§ 3347, subd. 11) the provisions of the chapter (18), in reference to Surrogates' Courts, are with certain exceptions, not affecting the question, only made applicable to an action or special proceeding commenced after September 1, 1880.

(Argued February 5, 1883; decided March 6, 1883.)

THESE are cross-appeals from judgment of the General Term of the Supreme Court, in the first judicial department, entered upon an order made June 30, 1882, which modified and affirmed as modified a decree of the surrogate of the county of New York, on the final accounting of the executors of the will of Richard Warren Weston, deceased. (See mem. of decision below, 27 Hun, 455.)

The testator died in May, 1873. These proceedings were instituted on the application of the executors in July, 1877. The surrogate's decree was entered in October, 1880.

The will, after certain devises and bequests, directed the executors to convert all the rest, residue and remainder of his estate, real and personal, into money, and to divide the net proceeds into three equal shares, one which he gave and bequeathed to them in trust, with power to invest and keep the same invested in bonds or securities of the government of the

United States, whereof the interest was payable in gold, or in such other securities as to them should seem most for the benefit of the fund designed to be. created, and to apply the interest, income and profits of such share to the use of his son Warren, until he should attain the age of twenty-five years, and then the share was to be paid over and transferred absolutely to him. The other two shares were in like manner directed to be invested and held in trust, one for the benefit of each of the testator's two daughters during her natural life. The executors were required, as soon as might be after the decease of the testator, to pay and discharge all his just debts. Letters testamentary were issued to the executors in June, 1874.

The principal subjects of controversy were in relation to fifteen hundred shares of the St. Louis and Iron Mountain Railroad Company, part of the assets which were undisposed of at the time of accounting, and in relation to certain real estate situate at Dobbs' Ferry, and expenditures thereon. The material facts in relation to them are stated in the opinion.

*George H. Foster & Samuel Hand* for contestants. The executors having disobeyed the testator's wishes, and having overstepped their powers in making the expenditures on the real estate, cannot be credited with them in their account. (*Cornwell* v. *Deck*, 2 Redf. 87 ; *Vyse* v. *Foster*, L. R., 8 Ch. App. 309 ; *Ackerman* v. *Emott*, 4 Barb. 623, 646 ; *Adair* v. *Brimmer*, 74 N. Y. 546 ; *Heineman* v. *Heard*, 50 id. 27 ; *Hopper* v. *Adee*, 3 Duer, 235.) The direction of the Supreme Court, as to reducing the allowance to the executors' counsel by the surrogate from the fund, was correct. (*Noyes* v. *Society*, 70 N. Y. 481 ; *Denn* v. *McGourkey*, 15 Hun, 443 ; *Hurd* v. *Warren*, 16 id. 622 ; Laws of 1870, chap. 359, § 12.) The Supreme Court had the discretion to reduce the allowance, and that discretion is not reviewable here. (*Noyes* v. *Children's Society*, 70 N. Y. 481.) Under the provision of the will the beneficiaries were entitled to the interest or income of the trust fund from the death of the testator. (*Williamson* v. *Williamson*, 6 Paige, 298, 306 ; *Cowenhoven* v. *Shuler*, 2 id. 132 ;

*La Ferrins* v. *Bulwer*, 2 Sim. 19 ; *Howe* v. *Earl of Dartmouth*, 7 Ves. 137 ; *Lupton* v. *Lupton*, 2 Johns. Ch. 614–627 ; *Hepburn* v. *Hepburn*, 2 Brad. 74, 76 ; *Feams* v. *Young*, 9 Ves. 549.) Where the relation of trustees and *cestui que trust* is created, trustees are obliged to take the same care and use the same diligence as factors and agents. They are answerable, not only for their own fraud and gross negligence, but also for all faults which are contrary to the care required of them. (*Ackerman* v. *Emott*, 4 Barb. 626 ; *King* v. *Talbot*, 40 N. Y. 76 ; 50 Barb. 453 ; Perry on Trusts, §§ 458–460 ; *Steele* v. *Babcock*, 1 Hill, 527.) Good faith or honest intentions do not excuse violation of instructions. (*Heinemann* v. *Heard*, 50 N. Y. 27.) The intentions of the testator as to the St. L. and I. M. R. R. stock, at the time of his purchase, is no protection to the executors. (*Adair* v. *Brimmer*, 74 N. Y. 539, 546, 550–551, 552–553, 554 ; *Ackerman* v. *Emott*, 4 Barb. 626 ; *Clough* v. *Bond*, 3 M. & C. 490, 496 ; *Ringold* v. *Ringold*, 1 H. & G. 25 ; *King* v. *Talbot*, 40 N. Y. 76, 78.) A direction to trustees even, to invest at discretion, does not authorize them to invest in securities, not legally approved, for the investment of trust funds. (Hill. on Trustees, 368, 369, 378, note 1, 494, 495 ; *Peacock* v. *Reddington*, 5 Ves. 794 ; *King* v. *Talbot*, 40 N. Y. 81, 83.) Trustees are responsible for doing acts unauthorized by the instrument creating a trust. (*Fenwick* v. *Greenwald*, 10 Beav. 412 ; *Pearce* v. *Pearce*, 22 id. 248 ; *Kellaway* v. *Johnson*, 5 id. 319 ; *Wilkinson* v. *Parry*, 4 Russ. 272 ; *Clough* v. *Pond*, 3 M. & C. 490 ; *Hancom* v. *Allen*, 2 Dick. 498 ; *Trafford* v. *Boehm*, 3 Atk. 440.) It does not make it prudent or diligent to have held these stocks, bonds and real estate contrary to the directions of the will, that the executor Ward, individually, or Baring brothers bought these St. Louis and Iron Mountain R. R. securities, or that the executor Gray owned half the Dobbs' Ferry property. (*Adair* v. *Brimmer*, 74 N. Y. 562 ; *McCabe* v. *Fowler*, 84 id. 318 ; *Ormiston* v. *Olcott*, id. 339 ; *Matter of Dean*, 86 id. 398 ; *Hun* v. *Cary*, 82 id. 65.) The surrogate could only pass on the correctness of pay-

ments to creditors and legatees, for necessary expenses and for the services of the executors, and whether they had been charged all the money, whether principal or interest, with which they were legally accountable, at the time of the settlement of the account, and the correctness of allowances for services and charges for increase. (*Seaman* v. *Whitehead*, 78 N. Y. 308; *Despard* v. *Churchill*, 53 id. 192; *Bevan* v. *Cooper*, 72 id. 317; *Riggs* v. *Craig*, Oct., 1882.) The costs in this matter having been allowed in October, 1880, should have been allowed in pursuance of the Code of Civil Procedure. (Code, § 3352; *Supervisors* v. *Briggs*, 3 Den. 173; *Rich* v. *Hosson*, 1 Duer, 617; *Smith* v. *Castlers*, 5 Wend. 81; *Bank* v. *Willoughby*, 1 Sandf. 667; *Scudder* v. *Gori*, 18 Abb. Pr. 207; *Meere* v. *Westervelt*, 14 How. 281; *Ackley* v. *Tarbox*, 19 Abb. Pr. 119; *Steward* v. *Lamoreaux*, 5 id. 14; *Hunt* v. *Middlebrook*, 14 How. Pr. 300; *Rader* v. *Road District*, 36 N. J. L. 282; *Theriot* v. *Prince*, 12 How. Pr. 451.) The surrogate's decree was erroneous in its provisions as to allowances. (*Devin* v. *Patchin*, 26 N. Y. 441; *Reed* v. *Reed*, 52 id. 651; *Seaman* v. *Whitehead*, 78 id. 306.)

*Aaron Pennington Whitehead* for executors. The General Term had no power to review the decree of the surrogate, because no exceptions were taken to said decree. (Code of Civ. Proc., §§ 2570, 2576, 997; *Ingersoll* v. *Bostwick*, 23 N. Y. 425; *Mayor of N. Y.* v. *Erben*, 24 How. 358; *Douglass* v. *Day*, 3 Keyes, 434; *Bissell* v. *Studley*, id. 213; *Enos* v. *Eigenbrodt*, 32 N. Y. 444; *Weed* v. *H. R. R. Co.*, 29 id. 616; *Hunt* v. *Bloomer*, 13 id. 341; *Brush* v. *Lee*, 1 Trans. App. 66; Redfield's Law and Practice of Surrogates' Courts, 777, 790.) If the executors decided in a *bona fide* exercise of a reasonable discretion not to sell the principal securities belonging to the estate, they cannot be called upon to bear a loss merely because the conclusion to which they came turned out unfortunately. (3 Williams on Executors [Perkins' ed.], 1895–1896, marg. pp. 1796–1797; *King* v. *Talbot*, 40 N. Y. 76; *Buxton* v. *Buxton*, 1 M. & C. 80; *Thompson* v. *Brown*, 4

Johns. Ch. 627; *Lansing* v. *Lansing*, 45 Barb. 193; *McRae* v. *McRae*, 3 Bradf. Surr. 199; *Rowth* v. *Howell*, 3 Vesey, 565; *East* v. *East*, 5 Hare, 343; *Johnson* v. *Newton*, 11 id. 160; *Clack* v. *Holland*, 19 Beav. 262–271; *Garrett* v. *Noble*, 2 Sim. 504; *McCabe* v. *Fowler*, 84 N. Y. 314; *Ormiston* v. *Olcott*, id. 339.) The executors did in good faith exercise a reasonable discretion and are fully justified in the course adopted by them. (*Hughes* v. *Empson*, 22 Beav. 181; *Bates* v. *Hooper*, 5 De G. M. & G. 337; *Morgan* v. *Morgan*, 14 Beav. 72; *Wightwick* v. *Lord*, 6 H. of L. Cases, 217; *Buxton* v. *Buxton*, 1 M. & C. 80; *Lowson* v. *Copeland*, 2 Bro. C. C. 156; *Marsden* v. *Kent*, Eng. L. R., 5 Ch. Div. 598.) The conclusion of the General Term that the executors exercised a reasonable discretion is a conclusion of fact, and no appeal lies to this court therefrom. (*In re Ross*, 87 N. Y. 514; *Davis* v. *Clark*, id. 623.) Executors have eighteen months in which to dispose of securities. (*Gillispie* v. *Brooks*, 2 Redf. 349.) The executors were justified in exercising the discretion they did in the management of the estate. (Perry on Trusts [2d ed.], §§ 444, 452, 457, 460, 465; Hill. on Trustees, 369, 378; 3 Williams on Executors [Perkins' ed.], 1797, 1804, 1805, 1816; *King* v. *Talbot*, 40 N. Y. 76; *Brayton's Ex'rs* v. *Graydon*, 23 N. J. Eq. 229–233; *S. C.*, 25 id. 561; *Peacock* v. *Livingston*, 5 Ves. 794; *Phillips* v. *Phillips*, Freeman's Ch. 11; *Lawson* v. *Copeland*, 2 Brown's Ch. 156; *Fletcher* v. *Walker*, 3 Madd. 73; *Tebbs* v. *Carpenter*, 1 id. 290; *Moyle* v. *Moyle*, 2 Russ. & M. 710.)

FINCH, J. The decree of the surrogate, and the judgment of the General Term, refusing to charge against the executors the loss resulting from the depreciation of the St. Louis and Iron Mountain railroad stock, were right and should be affirmed. The appellants do not attack this conclusion upon the ground of negligence or bad faith, and substantially concede that the discretion of the executors, if they had any, was exercised fairly and with ordinary prudence, although the result has been disastrous. But the argument is put upon the ground that by the

terms of the will it was made the duty of the executors to sell "promptly;" that the testamentary direction was "peremptory;" and any delay, not necessary and unavoidable, was a violation of an express duty, and so involved responsibility for loss. But the will contains no such arbitrary or peremptory command. It does direct a sale, but does not say when, or under what circumstances, or at all fetter the usual and ordinary discretion of executors to wait a reasonable time for the proper performance of their duty. What, under all the circumstances, was such reasonable time, and did the executors exceed it, became the vital questions on this branch of the case, and their answer involves a view of the surrounding circumstances, and some just and fair allowance for the peculiar emergency. It must be granted that the stock was somewhat of a dangerous and speculative character, subject to great and sudden fluctuations of value, and not such as a trustee could select for an investment of trust funds without responsibility for a loss. But the executors did not make this investment. They found the stock among the assets. Without their fault it came upon their hands, and they had to care for and dispose of it, with all its inherent risks on the one hand and possibilities on the other. That the testator thought well of it they had ample evidence. He had bought one thousand shares in August and September of 1872, at about fifty-nine per cent, and the remaining five hundred shares later. These last were not paid for by the deceased, but were being carried by his brokers. His death occurred on the 7th of May, 1873, and a memorandum relating to this stock was found among his papers, describing it as "to be held firmly; a dividend expected in two years." The executors thus found themselves confronting an emergency, and with the path of duty before them somewhat blind and difficult. Why the testator should have made the memorandum except for the guidance and enlightenment of those who came after him, it is impossible to say ; and while it did not bind them, it was advice they were justified in taking into account. The testator had acted upon the judgment contained in his memorandum. In January of 1873, the stock had sold at 94, but from that

time on, had fallen to 85 at about the date of testator's death. He, therefore, had held it firmly on a falling market, and so strengthened by his conduct the impression left by his written advice. Letters testamentary were granted on the 6th of June, 1873, and the judgment and discretion of the executors was then called into play, for it was possible to sell the stock at once for about 80. Should they do so, or wait, was the important inquiry, to be answered with sole reference to the welfare of the estate committed to their care. They consulted, and took the best advice attainable and determined to wait. The stock had been above par the year before, and under all the circumstances, with the advice and example of the testator both before them, and their own justifiable confidence in the value of the stock, it is quite certain that their conclusion was reasonable, and their delay excusable. As the stock continued to fall, the reason for waiting grew stronger to men who had confidence in its inherent value. After a delay of three months, came a panic in September. A storm of fright and distrust swept over the stock market, during which valuable securities were depreciated and sacrificed, and prices dropped suddenly and low. Certainly it was no time then to sell. The stock was paid for, and the estate strong and able to carry it through the unexpected emergency. If the executors then had lost courage, and, demoralized by the alarm around them, had thrown the stock overboard at 55, or less than its cost, it would have been easy to say that the trustees chose the worst possible time in which to sell, and acted from terror and not from judgment. And so they waited again, as prudent men similarly situated would have certainly done. The depression continued during the remainder of the year, but with symptoms of improvement in the early months of 1874. In February the recovery had brought the stock back to 67. At this point, it is said, the executors should have sold; but while the price was better than that of the panic, it was little better, and still much below its value when originally received. It is easy to see now that it would have been wiser to have sold, and had the executors known then what they and we know now, they would undoubtedly have done so. But they did not and

could not know. The indications pointed to an eventual restoration of value, and we cannot say that it was imprudent or unwise to expect and wait for it. But in April came another heavy fall, the stock dropping to 30, and in June of that year when their inventory was filed, it was appraised at 20, although on the 14th of that month it was selling at 15. That is the history of the first year's holding by the executors. Facts are put in evidence showing the expectation and progress of a movement for consolidation; the persistent holding by one of the executors, through the same period, of stock of the same corporation owned by him individually; and the similar holding of much larger blocks by business men of acknowledged capacity and judgment. Since the value of the stock at the hearing before the auditor was greater than the inventory value of June, 1874, the question of responsibility for loss relates wholly to the omission to sell during the first year. There is, and there can be, no rigid and arbitrary standard by which to measure the reasonable time within which the discretion of an executor directed to convert an estate into money must operate. If, in some instances, the English cases indicate a disposition to fix upon one year, because at that date the executor may be compelled to account, in other instances such fixed or arbitrary standard appears to have been rejected. (*Hughes v. Empson*, 22 Beav. 181; *Buxton v. Buxton*, 1 Myl. & C. 80; *Garrett v. Noble*, 6 Sim. 504; *Bate v. Hooper*, 5 De G., M. & G. 338; *Morgan v. Morgan*, 14 Beav. 72; *Marsden v. Kent*, L. R., 5 Ch. Div. 598.) The better opinion derived from them would seem to be that each case must stand upon its own facts; that what would be a reasonable time in one instance might not be in another; and while the one year allowed to close the estate may sometimes mark the limit of discretion, and is always a circumstance to be considered, it is not necessarily conclusive. In this State, at all events, there is no arbitrary standard. The executor, here, cannot be compelled to account until after eighteen months; and yet it may be his duty to sell even earlier than that, or to wait even longer, according to the circumstances of particular cases, and

the exigencies which exist. Where no modifying facts are shown to shorten or lengthen the reasonable time, the period of eighteen months may serve as a just standard. It was so held by the learned surrogate of New York in the case of *Gillespie* v. *Brooks* (2 Redf. 355). There the will directed the executors to invest the residue of the estate, and the duty of selling the bank, insurance, mining and manufacturing stocks on hand was just as plain and necessary as if there had been a specific direction to convert them into money. It was conceded, in that case, and held by the surrogate that a reasonable time for the disposition of the "irregular securities" would be eighteen months. Substantially the same doctrine was held in *Lockhart* v. *The Public Administrator* (4 Bradf. 21). While such period furnishes a convenient guide where no special circumstances exist, it must, after all, not be taken as a fixed or arbitrary standard. The test must remain, the diligence and prudence of prudent and intelligent men in the management of their own affairs. (*King* v. *Talbot*, 40 N. Y. 76 ; *Thompson* v. *Brown*, 4 Johns. Ch. 627 ; *McRae* v. *McRae*, 3 Bradf. 199.) Stocks of variable value ought not to be timidly and hastily sacrificed, nor unwisely and imprudently held. Even where there is a direction to sell, reasonable time must be given, and what that is must be determined in each case by its own surroundings. Here the estate was large. A trust fund was early constituted which furnished enough of income for the immediate wants of the beneficiaries. They made no complaint at the time because the stock in question was held. If the result had been a gain to them they would have been thankful for the delay. For the loss which did result we think, under all the circumstances, the executors should not be charged.

Among other assets left by the testator, and covered by the direction to convert into money, was a country seat of large value, situated at Dobbs' Ferry, and overlooking the Hudson river. The testator owned only the undivided half ; his partner, Gray, who became one of the executors, owning the remainder. The property was incumbered by mortgages of $54,000, which were outstanding and unpaid at the testator's death.

The executors tried to sell in the usual and ordinary way, at private sale, but failed. The range of possible purchasers was narrow. Those who could afford to own and keep up such a residence were not numerous, and the panic of 1873 tended to lessen their number and make them more than usually prudent and cautious. Such offers of purchase as were made fell far below the intrinsic value of the property, and the executors held it. They paid off the mortgages and expended further sums of $12,576.90, for taxes upon, and the care and preservation of the property. Of this last amount, $5,133.93 was paid during the first eighteen months of the executors' administration; and the balance of $7,442.97, later. The auditor found that from the testator's death to the date of his report there had been no such demand for the Dobbs' Ferry property as to establish a market price for it, and that said executors had not been able, by due diligence, to effect a proper sale of the property. He, therefore, allowed the payments by the executors upon incumbrances and for expenses, and the surrogate confirmed the allowance, but the General Term reversed so much of the decree as gave credit for the amounts paid upon incumbrances and the expenses incurred, upon the ground that a sale ought to have been made within the eighteen months, and the executors had no authority to pay off the mortgages. In so doing, it was declared, they were neither paying debts, nor converting the property for investment. It is now contended that the General Term were wrong for several reasons.

When the original account was filed which claimed the credits in controversy, the contestants filed specific objections. There was a general objection that the executors failed to convert all the property into money, and a special objection on the same grounds, naming the Dobbs' Ferry property, and alleging that the holding of the real estate had involved large expenses for care and management, insurance and other protection of the same and payment of interest thereon. The objections then added: "These objectors accordingly claim that the said executors are liable to make good to the said estate the losses sustained in manner aforesaid, of all which they propose to make

proof; and they also object to all *such* items of extra expenditures contained in the said account as have been *occasioned* by the *aforesaid* acts or omissions of the said executors." There was no objection to the payment of the mortgages. The items of such expenditure were stated in the accounts, but were entirely unchallenged. They were stated, too, as payments to "creditors." They were included in schedule D, which is described in the account as containing a statement of "all the claims of creditors presented to and allowed by us," and "of all moneys paid by us to the creditors of the deceased." The one-half of the mortgages was thus claimed to be a debt of the estate, for which it was liable, and which as a debt had been allowed and paid. To this claim no objection was filed; against it no evidence has been produced, and it will not do now to reject it on the ground that it was not a debt, and the estate was not bound for its payment. But further than that, it also appears that after the close of the evidence before the auditor, and when the contestants knew and understood the exact situation upon the proofs, their counsel formally notified the auditor that they should not press their objection to the account in respect to the North Shore and Staten Island Ferry Company, and the real estate at Dobbs' Ferry. When the case came before the surrogate, the infant contestants, through their special guardian, filed no exceptions to the auditor's report. The adult contestants did, but as to the Dobbs' Ferry property the surrogate held that the notice given to the auditor "was equivalent to a withdrawal of the objections referred to, and was done by counsel then representing the contestants, and their action cannot be interfered with by counsel subsequently retained or substituted." We are of the opinion that the surrogate correctly construed the notice and its effect. It amounted to a waiver and abandonment of the objections referred to. Good faith and fairness require that its force should be admitted. It stopped the argument in that direction before the auditor. It, perhaps, prevented an application to the auditor to open the proofs and take further evidence, and certainly, as we have seen, influenced and controlled the action of the sur-

rogate. We do not see how we can justly disregard it. The ground taken by the General Term is based upon the fact that the guardian for the infants did not unite in the notice. That is true, but he not only filed no exceptions to the auditor's report, but did not appeal from the decision of the surrogate. He is not here. The rights of the infants are not before us. The only persons before us and prosecuting the appeal are the very contestants, and those only, who withdrew these objections. They are bound by their own action, and the infants by the decree from which they did not appeal. So far then as the payment of incumbrances is concerned, we must hold they were debts for which the testator was personally liable. They are claimed to be such in the account; credited as such; not objected to, and we do not feel at liberty to charge the executors by presuming there was no bond or personal covenant. What remains is the question as to taxes and expenses incurred by reason of not selling the land. As to so much of these as accrued after the eighteen months, there would be room for very serious debate had not the objection been formally withdrawn. There was justice and fairness in that withdrawal. The evidence had shown that at the worst the executors, acting in good faith, and trying to do their duty, had only been guilty of an error of judgment. The contestants concluded either that no liability followed, or if it did, that it would be harsh and hard to enforce it, and so gave the notice which practically withdrew the objection. To allow them now to take back their notice and insist on the objection would permit one to trifle with the administration of justice in a manner which we cannot approve. We must, therefore, agree with the surrogate and disagree with the General Term as to the items relating to the Dobbs' Ferry property.

Both sides complain of the disposition made of the allowances granted by the surrogate. He awarded $7,500 to the executors for a counsel fee, to the contestants $1,000, and to the guardian *ad litem* of the infants $2,000. These allowances were made upon the authority of the law of 1870 (Chap. 359, § 12); and the General Term held that the repeal of that act

in 1880 (Chap. 245) did not prevent its application to the present case, but its just construction was subordinate to the provisions of the Code limiting the total allowance to $2,000. In that we think the General Term were right. In *Noyes* v. *Children's Aid Society* (70 N. Y. 481) we held that in giving allowances under the act of 1870 the surrogate is confined to the "manner" laid down in sections 308 and 309 of the Code, and cannot exceed the maximum limit of the amount which may be allowed, fixed by said sections, and must follow the process by which that amount may be arrived at, which is prescribed therein. The General Term has followed, and acted upon that decision, not only in the present case but in others. (*Down* v. *McGourkey*, 15 Hun, 444; *Hurd* v. *Warren*, 16 id. 622.) All that is now urged to the contrary is a suggestion of harmful consequences, and that the limit of $2,000 was never intended to be made applicable to "the long and expensive contests" in the Surrogates' Courts. We think it was, and are not without hopes that its effect will be to shorten their duration and render them less expensive, without at all endangering the ability of executors and administrators to defend themselves and the estates which they represent.

The appellants, however, insist that the power to make allowances is still further limited by the provisions of the Code of Civil Procedure, and those apply, because the costs were taxed in October, 1880, and after that Code took effect. Its own provisions leave it not applicable. By section 3347, subdivision 11, the eighteenth chapter, among others, is made applicable only to an action or special proceeding commenced on or after September 1, 1880, except as to certain sections which do not affect the question of costs before us. We see no reason, therefore, for disturbing the conclusion of the General Term upon the subject of the allowances. Other questions raised in the case have been examined, but need not be specially considered.

The judgment of the General Term, so far as it modifies the decree of the surrogate, by refusing credit to the executors for the amounts paid upon incumbrances, and for taxes and ex-

penses on account of the Dobbs' Ferry property, should be reversed, and in other respects affirmed with costs to the executors, to be paid out of the estate.

All concur.

Judgment accordingly.