In the Matter of the Estate of A. HART McKEE, Deceased.

Surrogate's Court, New York County, May 15, 1933.

*Hulbert & Heermance,* for the administratrix.

*Curtis, Mallet-Prevost Colt & Mosle,* for Andrew McKee.

*B. W. B. Brown,* for Virginia McKee Bouilliant-Linet.

*John S. Wise, Jr.,* and *O'Brien, Boardman, Conboy, Memhard & Early,* for Harriet McKee Stinson.

*Thomas E. White,* for The Fidelity and Deposit Company of Maryland.

*Terence J. McManus,* referee.

DELEHANTY, S. The major controversy in this proceeding involves the acts of the administratrix respecting shares of United States Realty and Improvement Company and of George A. Fuller Company, an allied or subsidiary company. The estate assets were comprised almost wholly of these shares. Deceased was a " specialist " in them. He traded in and out of them and invested practically all of his resources in them. At his death 4,000 shares of the realty company stock were held as part and chief collateral to an account which deceased carried in a brokerage house. The Fuller Company shares were likewise collateral to an account carried in another brokerage house. Outside these accounts deceased owned 14,400 realty company shares wholly unincumbered. He also owned some small lots of other securities, pledged and unpledged, respecting some of which the acts of the administratrix are likewise criticised.

Deceased died February 23, 1931, and letters testamentary were issued to his widow (his third wife) on March 4, 1931. The account here under scrutiny was filed December 21, 1931, and was supplemented by a further account on February 4, 1932. The accounting proceeding was initiated by petition of a daughter of deceased by his first wife filed some eight months after letters issued. Objections were filed by both daughters of deceased by his first marriage and

likewise by a son of deceased by his second marriage. There is evident in the record that undercurrent of hostility not unusual between family groups in circumstances such as exist here. One daughter objected to substantially every item in the account, including the funeral expenses; the other daughter raised issues only slightly less broad and the son made his criticisms chiefly respecting the retention of the shares above referred to.

The issues arising on the objections were sent to a referee whose report is now before the court. Exceptions thereto have been filed by all parties in interest. The administratrix seeks to have the court disapprove such of the findings of the referee as impose surcharges upon her. The objectants urge that the surcharges made are insufficient and that the findings limiting these surcharges should be disapproved and the surcharges increased and also that other requested surcharges should be made. In passing on these exceptions extended consideration is required of the conditions affecting the estate and the securities which were its chief assets.

United States Realty and Improvement Company had been in existence some twenty-seven years; was managed by men of high rank in the realty and financial field and had a good dividend record. Decedent was a specialist therein; and had great confidence in the stock as administratrix knew. During the period when the acts of administratrix were performed, there prevailed on the Stock Exchange where these shares were listed and throughout the world generally conditions described by the referee as " panicky." Speaking generally of this company, the referee says: " United States Realty & Improvement Company stock was not a highly speculative stock, as is contended by the objectants. Indeed, it was a seasoned security with an established dividend record extending over a period of years. It appears, too, that the management of the corporation was in the hands of men of high rank in the realty and financial worlds. * * *

" The decedent had abounding faith in it. The administratrix consulted persons of importance in the business and financial worlds, and was advised by some that the stock was intrinsically sound and worth more than the market price. On the other hand, she was advised by persons who, she says, were of equal importance, that the stock might sell at even a lower level. It further appears that a large block of this stock had been acquired by the decedent at $80 per share and a substantial loss in the sale of part of that block, namely, $68,875.50, had been suffered by him shortly prior to his death. Should the remainder of his holdings be sacrificed under the panicky conditions which obtained, even though the other parties interested demanded the sacrifice? I hold not."

The referee has found that throughout her administration the administratrix was actuated only by " unimpeachable motives " and that she " acted for what she deemed to be the best interests of the estate."

These findings negative the charge made by objectants that the administratrix was speculating in the estate's securities. A review of the testimony and the exhibits confirms these findings. In these circumstances, the court overrules the exceptions to the referee's report filed by objectants and predicated upon the claim that the administratrix should have liquidated the shares of United States Realty and Improvement Company immediately after her appointment.

The transactions of the administratrix respecting the brokerage accounts require more extended comment. In respect of the account with Pynchon & Co., the collateral was chiefly shares of preferred stock of George A. Fuller Company which the referee has found to have had no ready market. The administratrix eventually procured a private purchaser for these shares and closed out the account within a time and under circumstances which the referee has found to be reasonable. The circumstance that this brokerage house went into bankruptcy and because thereof certain securities were not recovered or were temporarily withheld by order of the bankruptcy court was justly held by the referee not to impose any liability upon the administratrix. The exceptions of objectants to the findings of the referee in respect of this account and its handling by the administratrix are likewise overruled.

The referee has held the administratrix liable in respect of her transactions with the Winthrop, Mitchell & Co. brokerage account. In this account were 4,000 shares of stock of United States Realty and Improvement Company. Between April 23 and April 28, 1931 (approximately fifty days after she received letters of administration), the administratrix sold 2,500 of the 4,000 realty company shares held as collateral and with the proceeds of such sale (supplemented by money received from the closing of the Pynchon & Co. account) the remaining 1,500 shares of realty company stock were released to the administratrix and added to the shares already owned outright thus bringing the total of such shares up to 15,900. In respect of this transaction, the referee has said that the administratrix should have liquidated the entire block of 4,000 shares of realty company stock within thirty days after April first. Accordingly he has held her liable for the difference between the average New York Stock Exchange price of these shares during April and the price which was actually realized. He has also surcharged her with an amount computed by applying the same average Stock

Exchange price to the 1,500 shares taken up by her and has directed the transfer to her of these 1,500 shares against payment by her of such surcharge. The rule of action adopted by the referee in respect of this surcharge is outlined on page 5 of his opinion wherein he said: " In view of the abnormal conditions which then obtained, and which, unfortunately, still obtain in the entire financial and industrial world, reasonable prudence demanded prompt action in the disposal of these securities. The administratrix had sought advice, not only of those who were interested in the estate, and who had urged that these speculative accounts be liquidated promptly, but also from sources supposedly familiar with market conditions generally, and the contrariety of opinion from this source should have hastened her decision to dispose of these stocks."

In effect the objecting parties contend for the same rule of action. They say on page 3 of their main brief: " In fact, the unprecedented financial conditions of the time in question, far from excusing procrastination on the part of the administratrix, made prompt action even more imperative than would ordinarily be the case with regard to margin accounts of this character."

There is nothing to differentiate the shares of United States Realty and Improvement Company which were held in the Stock Exchange house from those which were held outright in the custody of the administratrix. They had the same value, were subject to the same hazards of loss and had the same prospect of increase in price. The 4,000 shares in the stock house and the 14,000 shares in the safe deposit box had precisely the same quality. The same monetary situation would exist if the deceased at the time of death owed a demand obligation equal to the debit balance in the stock account and owned outright 18,000 shares of realty company stock. It may be said, of course, that the stock house had control over the 4,000 shares and might have resorted to a sale of them. The fact here is that the stock house made no demand that the account be liquidated nor was any step ever taken by it in hostility to the estate. It is impossible to differentiate the position of the administratrix in respect of the 4,000 share block from that in respect of the 14,000 share block. If in good faith she decided that the shares of the realty company were intrinsically sound and that the interests of the estate required that they be held, her judgment in that respect applied equally to the 4,000 shares in the custody of the stock house. The mere fact that assets of an estate are in a stock account does not require liquidation without considering other factors. (*Matter of Mercantile Trust Company,* 156 App. Div. 224; *Matter of Lazar,* 139 Misc. 261.) In the first cited case 5,200 shares of stock (substantially the whole estate) were carried on margin by

a stock house subject to a debit balance of over $250,000. The account was continued by the trust company executor from April to September before liquidation. The trust company was surcharged for loss in this interval. On appeal, the surcharge was reversed and the action of the trust company in carrying the account vindicated. The court cited *Matter of Weston* (91 N. Y. 502) as complete authority for the result reached. In the *Weston Case* (*supra*) reference to the printed record on appeal in the Court of Appeals discloses that deceased owned outright 1,000 shares of a railroad company and had purchased another 500 shares through brokers who held them subject to a lien of $45,000. The testator died May 7, 1873. Letters issued June 10, 1873. Until June 8, 1874, the executors carried this stock account and then paid the debit balance and took up the shares. They still had on hand in 1879 (when their account was filed) the shares of a reorganized company in substitution for the old shares exchanged by them. Meantime their value had shrunk materially. Nevertheless the Court of Appeals held the executors to be without blame and discussed the duties and responsibilities of estate representatives in language which need not here be quoted but which is plainly applicable to the present situation. In the *Mercantile Trust Company Case* (*supra*) the court comments on the fact that the testator " was a man who had been a specialist in Anaconda stock and had been trading in their office for some time, and that he confined his operations \* \* \* to this particular stock." The parallel to the case here for decision is obvious. In *Matter of Lazar* (*supra*) the administrator failed to close a stock account for four months after letters issued. He was absolved from surcharge for the resultant loss.

The general principles announced in the *Weston Case* (*supra*) have been repeatedly approved and have been specifically adopted as sound in *Matter of Clark* (257 N. Y. 132). This last cited case has been regarded generally as restating the principles applicable to the determination of liability of fiduciaries. In *Matter of Pratt* (143 Misc. 751) and *Matter of Kent* (146 id. 155) Mr. Surrogate FOLEY has learnedly and comprehensively discussed these rules of liability. It is unnecessary to do more than say that these decided cases make clear that a fiduciary dealing in good faith with a stable security is protected against surcharge whether the security be owned outright or be subject to a lien. All of the rules established by the cases are directed to enforcing the standard of reasonable and discreet action by a fiduciary. There is no requirement that fiduciaries shall exhibit greater wisdom and prescience than that shown by men versed in financial affairs. Whether as in *Matter of Weston* (*supra*) the case

deals with the panic of 1873 or as in *Matter of Varet* (181 App. Div. 446) with the panic following the outbreak of the World war, or as in *Matter of Kent* (*supra*) with the current depression, it is recognized always that losses attributable to causes beyond the control of fiduciaries are not to be charged to them. This court cannot ignore the knowledge acquired from performance of its own functions in hundreds of accounting proceedings that shrinkage of values has been universal and that fiduciaries of high and low degree alike failed to perceive the approach of the current industrial storm and failed to protect the assets of their trusts. Indeed it would require some thought to determine what type of security could have been sought by fiduciaries which would have withstood the onslaught of this depression. That large percentages of capital value have disappeared in the case of so-called legal investments is a commonplace in the administration of estates in this court. Corporate fiduciaries of the highest standing have retained securities now showing huge losses though these corporations are directed by men with access to comprehensive financial information. Individual and inexperienced fiduciaries should not be required to exhibit a greater degree of discretion nor held to stricter standards of liability.

The position of administratrix was not altered by reason of demands made upon her by distributees. Neither does she gain immunity because counsel for one of the latter withheld relevant information. The responsibility for action or inaction was always hers. The comment in *Matter of Thompson* (41 Misc. 420, at p. 424) is applicable here. It is noteworthy that distributees now seeking surcharge have themselves retained some or all of the shares in the realty company allocated to them in June, 1932, by administratrix. Similar inconsistency of action of beneficiaries evoked comment by the Court of Appeals in *Matter of Clark* (257 N. Y. 132, at p. 139). In the light of the facts developed on the hearing, the handling by administratrix of the Winthrop, Mitchell & Co. account was not unreasonable. Accordingly the court sustains the exceptions of administratrix to such of the findings as surcharge her with loss on the 4,000 shares held in the Winthrop, Mitchell & Co. account; and holds that the result of her actual transactions in such shares should be allowed in her account.

In respect of the surcharge based on failure of the administratrix to liquidate promptly the 3,000 shares of realty company stock set apart for payment of debts and administration expenses, her exceptions are overruled. She had knowledge that claims for taxes would soon be payable and was aware, too, that an accounting might be demanded of her in October. Having determined to sell these

shares, she should have sold them at least as soon as the date fixed by the referee. She was properly surcharged for loss thereon.

As respects the stock of Davison Chemical Company, administratrix did not assert that she held it for any proper estate purpose. On the contrary, she claimed to be the owner of these shares and, therefore, to have held them for her own account. That claim has been disallowed. She was properly surcharged with loss on these shares. Her exceptions to the referee's report in this respect are overruled.

The administratrix has been surcharged also with an overpayment of $1,000 to a tax expert. The facts presented to the referee warranted this surcharge. The exception thereto is overruled.

Administratrix claimed credit for the sum of $5,000 drawn by her out of estate funds on account of prospective commissions. This payment to herself was unwarranted until allowed by the court. She was properly surcharged with the amount thereof and with six per cent interest thereon from the date of withdrawal to the settlement of her accounts. Her exceptions to this surcharge are overruled. She will, however, be awarded commissions in the decree to be entered settling her account.

In respect of the credit claimed by administratrix for payments to counsel, the issue before the referee was limited. There was pending no petition to fix fees of counsel and the only issue was whether the particular payment reported in the account was proper or not. The referee has found on sufficient evidence that the payment was proper and should be allowed. These findings of the referee will be sustained. In so far as the referee undertook to fix total fees his findings must be disapproved since that issue was not presented.

The expenses of the accounting proceeding will be charged against the general estate.

Submit decree on notice modifying and confirming the referee's report and settling the account accordingly.