In the Matter of the Estate of PETER JUNKERSFELD, Deceased.

Surrogate's Court, Westchester County, January 29, 1934.

*Robert P. Smith*, for the Westchester Title and Trust Company, executor.

*Prentice, Collins & Dwight* [*Ezra P. Prentice* and *James F. Collins* of counsel], for the objectors.

SLATER, S. This is an account of proceedings by one of the executors, namely, the corporate executor. The decedent's widow is the other executor and she does not join in the accounting. In fact, she joins with others interested in the estate in filing objections to the account.

The decedent died March 18, 1930, and letters testamentary were issued to the two executors on May 12, 1930. The accounting party charges itself with principal items in the amount of $219,125.02; with increase of principal by reason of stock dividends, $5,979.48; with income of $13,399.66; decreases in Schedule " B " of losses arising, $161,306.28; with payment of expenses of administration, $13,541.20; payment of transfer taxes, $9,255.19; payment of debts, $36,178.91; payment of legacies, $14,759.64, leaving a balance of $1,293.71 in cash and $2,169.23 in stocks and notes receivable. All the securities were common stocks, a very substantial amount of which were in the companies known in the market as " Insull Investments."

The will provides for the payment of legacies, gives other directions, and out of the residuary gives one-third to the widow, one of the executors, absolutely, and gives to the County Trust Company of White Plains, a trustee, two-thirds of the residuary estate in trust for the use of the wife for life with remainder to the two adopted daughters, Mary Josephine Junkersfeld and Florence Rita Junkersfeld, and Patrick J. Boyle, a brother-in-law.

The will contains no paragraph which permits the trustee of any trust created to hold common stock and the lack of such a clause in the will becomes a very significant factor in the case. The wife and the Westchester Title and Trust Company were named as executors of the will. The decedent in professional life was an engineer and had been connected in some way with the Insull corporations and with Stone & Webster.

The widow, the two adopted daughters and two legatees object

to the account. They set forth that Anna B. Junkersfeld, the widow executrix, was excluded from the control and custody of the assets and denied active control of the estate.

Coexecutors constitute an entity and are regarded in law as an individual person. They all have a joint and entire authority over the entire property. If the property is in the custody of one, he is deemed to hold it not for himself but for all. (*Barry* v. *Lambert*, 98 N. Y. 300, 308.)

Upon the evidence submitted, I find that the first objection is without merit, as the widow executrix was an active participant in the conduct of the estate through her own testimony; the testimony of Adolph Kappus, the attorney for the estate; the testimony of the trust officer, and the treasurer of the accounting executor.

The second objection recites the list of securities, which are as follows:

| | Value |
|---|---|
| 10 shares American Can Company, common stock... | $1,420 00 |
| 10 shares American Maize Products Corporation, common stock.................................. | 350 00 |
| 20 shares Amoskeag Manufacturing Company, common stock.................................. | 260 00 |
| 30 shares Anaconda Copper Mining Company, capital stock...................................... | 1,893 75 |
| 302 shares Associated Engineers Corporation, capital stock...................................... | 15,100 00 |
| 20 shares Continental Can Company, common stock. | 1,308 75 |
| 20 shares Erie Railroad Corporation, common stock.. | 955 00 |
| 50 shares Federal Electric Company, Inc., preferred stock...................................... | 7,000 00 |
| 52 shares General Public Service Corporation, common stock...................................... | 2,294 55 |
| 40 shares Gold Dust Corporation, common stock.... | 1,787 50 |
| 305 182/200 shares Insull Utility Investments, Inc., common stock................................. | 20,437 85 |
| 50 shares Marine Midland Corporation, capital stock. | 2,050 00 |
| 374 336/400 shares Middle West Utilities Company, common stock................................. | 13,254 60 |
| 25 shares Middle West Utilities Company, preferred stock, series "A"............................... | 2,568 75 |
| 1 warrant for the purchase of 25 shares Middle West Utilities Company " B ".................... | 168 75 |
| 50 shares Midland Utilities Company, prior lien 7%.. | 5,437 50 |
| 20 shares Montgomery Ward Company, common stock...................................... | 850 00 |

| | Value |
|---|---|
| 16 35/40 shares The North American Company, common stock | $2,025 45 |
| 116 shares Public Service Corporation of Northern Illinois, common stock | 31,390 00 |
| 10 shares The Pittston Company, common stock | 221 25 |
| 100 shares The Public Utility Holding Corporation of America, common stock | 2,450 00 |
| 10 shares Sears, Roebuck & Company, capital stock | 827 50 |
| 30 shares Standard Gas and Electric Company, $4 cumulative preferred stock | 1,972 50 |
| 1 warrant for the purchase of 25 shares Middle West Utilities Company | 106 25 |
| 75 shares Stone & Webster, Inc., capital stock | 7,462 50 |
| 50 shares Union Electric Light and Power Company of Illinois, 6% preferred stock | 5,100 00 |
| 102 61/70 shares United Founders Corporation, common stock | 3,118 28 |
| 25 shares United States Bond and Mortgage Corporation, common stock | 50 00 |
| 20 shares United States Electric Power Corporation, common stock | 346 25 |
| 50 shares United States and Overseas Corporation, common stock | 900 00 |
| $800 par value Amoskeag Manufacturing Company gold bonds, due January 1, 1948 | 652 00 |
| $3,000 par value Munson Steamship Line secured gold bonds, due January 1, 1937 | 2,670 00 |
| $2,500 par value Punta Alegre Sugar Company gold notes, due October 1, 1930 | 1,000 00 |

The third objection is made upon the theory that the widow executrix has had nothing to do with the estate as the accounting executor is therein charged with retaining the securities without investigation and notwithstanding the fact that the said investments were not authorized by law or by the will, were speculative in character, and were declining in value. This is a rather severe admission to be made by the objecting party who is herself one of the executors. If there is any negligence in the handling of the estate, it belongs equally to the two executors. The testimony is convincing that, from the very start (the decedent having died in the midst of the financial depression) the widow executrix wanted the securities kept and not sold. This is evidenced by the fact that the decedent owed about $32,000 on three certain notes to

banks in New York and Chicago. Payment was demanded and it was not until November, 1930, when the two executors, the accounting one and the widow executrix, applied to this court for authority to borrow from the banking department of the accounting executor a sum sufficient to pay off the decedent's notes. There is no proof that the widow expressed a demand that the securities be sold in order to pay these debts. The evidence is that she personally advanced money to pay the transfer tax rather than sell the securities.

At the time in November, 1930, when application for an order of the court was made, the widow and the two children, one of them of age and one under age, signed a paper offered in evidence consenting that " the Westchester Title and Trust Co. and Anna B. Junkersfeld as Executors of said estate may and they are hereby authorized to borrow from the Westchester Title and Trust Company, the sum of $36,404.00 to take up certain obligations of the deceased."

The believable evidence is to the effect that the matter of the executors holding the stock was discussed between the two executors. A mass of letters was offered in evidence showing that the executors were both in consultation about the securities. On October 6, 1930, apparently appreciating that when the executors finished the County Trust Company would take hold as trustee, the accounting executor wrote to the County Trust Company asking for a conference regarding this estate, referring to a list of securities which was furnished sometime before and stating that '' some action must be taken immediately with respect to selling certain securities to pay the notes which are long overdue. I realize that the moment is most unfavorable for the sale of the securities and I should like to have your advice and possibly the advice of the Surrogate in the premises." A reply was received from the vice-president of the County Trust Company saying that " it would be almost a calamity to be compelled to dispose of securities upon present depressed market values, and we certainly would appeal to the Surrogate for his cooperation in waiting for a more profitable time."

Minutes of meetings of the trust committee of the accounting executor were offered in evidence. They disclose that meetings of the committee were held May 22, 1930, July 24, 1930, October 22, 1930, and November 12, 1930, and this estate was discussed. Minutes were made of the matters discussed with regard to the estate, particularly with regard to the payment of the overdue notes. At the meeting of November 12, 1930, the trust officer stated that, while one of the interested parties was an infant, the other two were of age, and he expected to get authority from all

the beneficiaries ratifying his action as trust officer in obtaining an order of the surrogate to secure a new loan to pay off the original debtors. The application to this court was made upon the petition of the two executors and set forth the indebtedness and the collateral held by the banks; that there were no cash funds available and that " your petitioners deem it for the best interests of this estate that said lien and notes be paid in order that the collateral be protected;" and that petitioners believed that " an order of this Court authorizing them to borrow a sum from the Westchester Title & Trust Company sufficient to pay the lien and notes hereinbefore referred to, and to pledge the securities of the Estate as collateral for the said loan." It was signed and verified by the accounting executor and by Anna B. Junkersfeld, executrix.

The objections charge that the said bonds and shares of stock should have been sold in May, 1930. The main objector, forgetting possibly that she was an active participant, is one of the two executors.

Executors in the settlement of estates should have such time as good sound judgment may require to protect the estate against the sale of securities in a market that is, in common knowledge, depressed.

The courts must be guided by what is common knowledge. It is common knowledge that since October, 1929, this country has been passing through a financial panic wherein the values of realty and personalty have shrunk to a measure beyond belief. (*Matter of Winburn*, 140 Misc. 18.)

It must be kept in mind that these securities were purchased by the testator and held by him at the time of his death. They were in no instance an investment by the executors upon their own initiative.

Surrogate DELEHANTY, in *Matter of Beadleston* (146 Misc. 548, 550), said that " whatever may be said in retrospect of the judgment of these executors in retaining speculative securities for a period of over two years, and in a generally declining market, it is also a matter of common knowledge that scores of individuals of wide business experience have dealt with their own securities in precisely the same way."

In *Matter of Weston* (91 N. Y. 502, 511) the court said: " Where no modifying facts are shown to shorten or lengthen the reasonable time [meaning the time in which to sell securities], the period of eighteen months may serve as a just standard." The ultimate desire must remain, however, " the diligence and prudence of intelligent men in the management of their own affairs."

The fifth, sixth and seventh paragraphs of the objections set forth

the indebtedness of the decedent to the three banks. After November, 1930, the securities declined in price, the so-called " Insull Securities " shrivelled up and became quite a total loss. Other securities had to be provided to protect the note given to the banking department of the accounting executor. Things had become so bad with regard to the common stock of this estate that in May, 1932, practically all the securities had to be used as collateral and even that much was not enough.

The oldest of the two adopted children had been of age for two or three years and, in fact, was of age at the time the father died. The other adopted child did not become of age until September, 1932. The testimony of the trust officer, backed up by the minutes of the trust committee of the accounting corporate fiduciary, discloses the fact of the prior talk of the parties in relation to ratifying the action of holding the stock when the infant became of age. The testimony of the trust officer was that the talk was had in the spring of 1932. Just as soon as the youngest daughter became of age the widow executrix and her two daughters came into the office of the accounting executor and signed the following consent: " We, the undersigned, being beneficiaries under the Last Will and Testament of Peter Junkersfeld, late of the Village and Town of Scarsdale, deceased, do hereby authorize and request the Executors under said last Will and Testament, to hold all securities owned by said Peter Junkersfeld at the time of his death, until the market for the same, in the opinion of said Executors, has improved sufficiently for the disposal of the same.

" We do hereby further consent that all transfer and inheritance taxes and expenses be paid out of the income of said Estate.

" Dated, September 13th, 1932."

This paper was signed by the widow and the two children, and, in giving their evidence, they did not make denial. It is one of the pieces of evidence that makes estoppel inescapable.

An equitable estoppel prevents a person, upon principles of honesty and fair and open dealing, from asserting rights, the enforcement of which would, through his omissions, or commissions, work fraud and injustice. (*Rothschild* v. *Title Guarantee & Trust Co.*, 204 N. Y. 458, 464.) An estoppel rests upon the word or deed of one party upon which another rightfully relies and so relying changes his position to his injury. (*Metropolitan Life Ins. Co.* v. *Childs Co.*, 230 N. Y. 285, 292; *Com'l. C. Corp.* v. *Northern Westchester Bank*, 256 id. 482, 489; *Matter of Cooke*, 147 Misc. 528, 534; *Matter of Kent*, 146 id. 155, 161; *Matter of Packard*, Id. 65, 68.)

The court said in *Matter of Garvin* (256 N. Y. 518, 520): " Towards the widow, who was a beneficiary of the trust fund, and who acqui-

esced in, if indeed she did not encourage retention of the securities, failure to sell was a misfortune, not a wrong."

In February, 1933, the accounting executor ceased to do business as a trust company. Its depositors were paid. Its banking department loans were taken over by the Bank of Manhattan in the City of New York and after that time the securities put up as collateral to the note were sold and applied to the note. Even as late as March 20, 1933, the evidence shows that Mr. Ray, the trust officer, had three talks with the widow executrix over the telephone and at that time she refused to consent to sell any of the securities. This is from her own testimony.

The widow executrix is sixty-three years old. She is a college graduate and had had business training until her marriage to the decedent. She is a highly intelligent woman. Her own testimony shows that since her husband's death she has been dealing in the market. Her statements of lack of information, that she was not told about the estate, that she did not know this or that, are not borne out by the evidence.

While the whole story regarding this estate is an unhappy one and is the result of general financial conditions and particularly because of the debacle of the so-called " Insull Corporations," it provides no justification for surcharging these two executors.

Upon all the facts in the case, I decline to surcharge the accounting executor or the widow executrix. The picture contains a corporate executor and a widow executrix. The stock which the decedent, her husband, had purchased in his lifetime was good enough for her. She, like most people, had confidence in the stocks, in the times, and in the country. The two together could little know or anticipate the Insull catastrophe. The beneficiaries under the will were seeking to have the stocks held for a better market. They were doing just what most of us would probably have done, not wanting to take the loss then. And the erosion of the times has eaten into the estate to such an extent that there is no estate left. In my judgment, the two executors are protected by the facts as well as by the estoppel.

From the whole evidence, it is apparent that the accounting executor was at all times laboring under the honest belief that it was holding these securities at the request of the distributees. No charge is made against the accounting executor, or either executor, of dishonesty or fraud, nor is it claimed that they endeavored to gain profit for themselves. There is a distinction between negligence and mere error of judgment and the fiduciary acting honestly and with ordinary prudence is not held liable for unfortunate results

which it could not be expected to foresee and was powerless to prevent. (*Matter of Clark*, 257 N. Y. 132.)

In the wave of depression that engulfed the country, with securities of all sorts, including those of the highest class, shrinking in value, a prudent business man dealing with his own investments would have been in doubt as to whether to hold or sell. (*Matter of Sprong*, 144 Misc. 293, 296; *Matter of Pratt*, 143 id. 751, 753; *Matter of Chaves*, Id. 868; *Costello* v. *Costello*, 209 N. Y. 252, 262; *Green* v. *Crapo*, 181 Mass. 55, 58.)

I hope that this portrayal may serve as a lesson to executors, corporate or otherwise, who are tied up with other executors who are members of the family, and who rely upon words of distributees. There is just one way to wind up an estate and that is according to law — to pay the debts, and, if the beneficiaries, executors and others are disinclined to follow the law, then the non-family executor, corporate or otherwise, might better resign and escape the kind of charges that are made in these objections.

The objections are dismissed.

Submit decree in accordance with this opinion and decision.